**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LEWIS STEIN, Individually and on Behalf of All Others Similarly Situated, | : : : | **Case No.:3:13-cv-286-VLB** |
| Plaintiff, | : : : | **CLASS ACTION** |
| v. | : : : : | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| TANGOE, INC., ALBERT R. SUBBLOIE JR., GARY R. MARTINO, and GARY P. GOLDING, | : : : : | **DEMAND FOR JURY TRIAL** |
| Defendants. | : : : : : : | |

1

# Table of Contents

I.  NATURE OF THE ACTION ...................................................................... 5

II.  JURISDICTION AND VENUE ............................................................... 12

III.  PARTIES ................................................................................................ 12

IV.  DEFENDANTS MAKE MISLEADING STATEMENTS TOUTING TANGOE'S
ORGANIC GROWTH ..................................................................................... 14

V.  WITNESSES WITH PERSONAL KNOWLEDGE ................................. 18

VI.  TANGOE OVERSTATES ITS ORGANIC GROWTH .......................... 20

   A.  *Investors understood "organic growth" to refer to growth in Tangoe's Core Subsidiary,
not to the growth obtained by shifting existing customers into the Core Subsidiary.* .............. 20

   B.  *When it acquires a company, Tangoe takes three steps to "gobble up" its revenues.*..... 20

     Step 1: Tangoe attributes all existing contracts on which the subsidiary has not begun to
perform to the Core Subsidiary............................................................................ 21

     Step 2: Tangoe attributes any new revenue generated by the acquired companies to the Core
Subsidiary. ........................................................................................................ 22

     Step 3: Tangoe migrates the acquired company's customers to its platform, and attributes
revenues from those clients to the Core Subsidiary.............................................. 23

   C.  *Tangoe understates the post-acquisition revenues of the companies it acquires, and thus
overstates the core subsidiary's revenues and its organic revenue growth.* ............................ 24

     HCL........................................................................................................................ 24

     Telwares ................................................................................................................ 25

ProfitLine ....................................................................................................... 26

D.     *Tangoe's Core Subsidiary, unlike the companies Tangoe acquired, generates deferred revenues. Thus, that Tangoe has not generated more deferred revenues to keep pace with its revenue growth is evidence that Tangoe is growing by acquiring revenues rather than by growing its revenues organically.* ........................................................................... 28

It is extremely unlikely that Tangoe could double the revenues of the Core Subsidiary without generating significant increased deferred revenues. ................................................ 32

That Tangoe did not generate deferred revenues is evidence that Tangoe grew its revenues by acquiring its subsidiaries, since the companies Tangoe acquired did not generate significant deferred revenues. ........................................................................................ 37

VII.   THE FALSE STATEMENTS WERE BOTH MATERIAL AND MADE WITH SCIENTER ...................................................................................................... 39

A.     *Tangoe's business.* ........................................................................................ 39

B.     *Two of Tangoe's four critical metrics are recurring technology organic revenue growth and deferred revenue.* ........................................................................................... 40

Organic revenue growth is a key metric of companies like Tangoe. .................................... 40

i.     Defendants have said organic growth is a key metric of Tangoe and that they regularly monitor it. ...................................................................................................... 43

The difference between organic growth below 20% and organic growth above 20% is the difference between Tangoe succeeding and Tangoe failing. ................................................ 43

C.     *Additional facts probative of scienter or culpable participation* .................................. 44

Defendants Subbloie and Martino received weekly memoranda and participated in weekly conference calls in which Tangoe's revenues were exhaustively discussed ........................... 44

Defendants all sell millions of dollars of shares. ................................................................ 45

Defendants Subbloie and Martino have already committed fraud as CEO and CFO of a

company backed by Defendant Golding's Edison Ventures. ................................................ 46

Edison Ventures and Defendant Goldin are closely involved in Tangoe's management. .... 47

Tangoe may have engaged in earnings manipulation. ......................................................... 47

VIII.    LOSS CAUSATION ....................................................................................... 48

IX.    POST CLASS-PERIOD EVENTS CONFIRM THAT TANGOE HAD BEEN

IMPROPERLY CLAIMING ITS REVENUE GROWTH WAS ORGANIC ............................. 49

   A.    *Wedbush confirms Tangoe had been overstating revenue growth.* ............................... 49

   B.    *After Tangoe's fraud is exposed, Defendants lower estimates of Tangoe's organic*

   *growth rate.* .................................................................................................................. 50

X.    PLAINTIFF'S CLASS ACTION ALLEGATIONS ............................................................ 52

XI.    COUNT I:(Against Tangoe, Subbloie and Martino For Violations of  Section 10(b) And

Rule 10b-5 Promulgated Thereunder) ........................................................................... 56

XII.    COUNT II (Violations of Section 20(a) of the Exchange Act Against The Individual

Defendants) ................................................................................................................... 59

Lead Plaintiffs Lewis Stein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Consolidated Class Action Complaint (the "Complaint") against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  <u>NATURE OF THE ACTION</u>

1.     This is a federal securities class action on behalf of a class consisting of all persons or entities other than Defendants, who purchased or otherwise acquired Tangoe common stock during the period between July 27, 2011 through September 4, 2012, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  This class action is brought under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

2.     Tangoe primarily develops and markets products that help companies manage and control their fixed and mobile communications assets and costs. These products helps companies track sourcing, asset procurement, services provisioning, invoice processing, expense allocation, bill payment, policy enforcement, usage management, and inventory.

3.     Tangoe was incorporated in 2000 and was not profitable in any fiscal period (quarterly or annual) until 2012. Investors have no interest in investing in a company that incurs perpetual operating losses. Absent evidence that Tangoe could be profitable, therefore, Defendants knew that it would not be able to sell its shares to investors and that its share price would decline.  The individual defendants also knew that, without such evidence, they would not be able to sell their own personally held Tangoe shares.

5

4.      In the investing and business world, revenue growth is usually classified as being either "organic" or "inorganic."

5.      Organic revenue growth is revenue growth generated by a business as it historically exists. It is generated by finding new customers, selling more product to existing customers, or developing and selling new products. Such growth is particularly attractive to investors because it suggests both that the company is growing revenues because its products are attracting and satisfying customers, and that the business is likely to continue to grow in the future.

6.      Inorganic revenue growth, in contrast, provides much less evidence that the business is likely to generate profits and generate positive shareholder returns, and is thus less attractive to investors.  If a company buys a competitor whose annual revenues are $10 million, for example, the company's revenues are likely to grow by $10 million if it only manages not to lose any revenues of the company it acquired. Such growth is not "organic" because the growth has essentially been purchased. Inorganic revenue growth is much less attractive to investors, because: (a) buying competitors is generally a more expensive way to generate revenue growth as compared to selling existing customers more products or generating new customers for existing products; (b) there are generally a finite number of competitors to acquire, meaning that this strategy is inherently short lived; and (c) after an acquisition, the acquiring company must still bear the acquired company's costs meaning that the revenue may not generate any additional profit.

7.      For Tangoe, the organic growth metric was particularly important to investors. Tangoe claims that it sells what business mavens have termed Software-as-a-Service, or "SaaS." SaaS businesses develop software, and offer it to their clients via off-site servers located in the

"cloud."  Once the software has been designed, there is very little incremental cost to a SaaS company associated with selling it to 100 clients as opposed to 1. Stated differently, SaaS businesses scale virtually without cost, as most of their costs are incurred up-front when they develop the software. Thus, for SaaS businesses, a large fraction of every new dollar in organic revenue growth is pure profit.

8.      Because investors expect that new revenue is nearly all profit for SaaS businesses, investment banks specializing in SaaS businesses offer one piece of advice for all of them to capitalize on this insight: show investors organic growth, preferably above 20% per year. And to benefit from these expectations, Defendants consistently told investors during the Class Period that Tangoe's plan was to grow its way out of unprofitability through organic growth by 20% organic growth, every year, over the long term. Indeed, growth is so important to Tangoe that Defendants repeatedly told investors "we regularly review our recurring revenue growth to measure our success."

9.      Business analysts typically measure organic growth by taking all revenue growth and subtracting acquired companies' contribution to revenues. Thus, if Tangoe buys one company in 2011 and earns $10 million that year from that company, Tangoe's organic growth is calculated by removing $10 million from Tangoe's 2011 revenues and calculating the resulting growth amount. Then, analysts take the remainder of the revenue growth to determine the organic revenue growth *rate*.

10.     Between January 2011 and July 2012, Tangoe acquired five companies: HCL Expense Management Inc. ("HCL"), Telwares, Inc. ("Telwares"), ProfitLine, Inc. ("ProfitLine"), Anomalous Networks, Inc. ("Anomalous"), and ttMobiles, Inc. ("ttMobiles"). Defendants knew that investors focused on Tangoe's organic growth; Defendants did as well. But the multiple

acquisitions made it difficult for outsiders to discern how much of Tangoe's growth was really organic, and how much was simply growth that Tangoe had bought through acquisitions. Defendants thus provided estimates of Tangoe's organic growth -- growth minus the acquired companies -- and separate estimates of most of the acquired companies' contribution to its revenues.

11.     But in both measures, Defendants dramatically understated the acquired companies' contributions to revenue, thus overstating the revenue growth of Tangoe's historical business (Tangoe's "Core Subsidiary") and thereby Tangoe's organic growth and organic growth rate. They did so in three ways, which collectively ensure that they label virtually any growth in the acquired company's revenues -- and then even the acquired companies' revenues themselves -- "organic".

12.     First, three of the companies Tangoe acquired had, at the time of acquisition, existing contracts with new customers that had been signed but where the acquired company had not begun performing. Tangoe attributed revenues from those clients to the Core Subsidiary, even though the acquired company had signed the contracts, and Tangoe would make the acquired company service the contracts. By doing so, Tangoe attributed about $4-6 million in additional revenues to its Core Subsidiary that were actually earned by the acquired companies, in or around Q1-Q2 2011, and Q1 2012.[1]

13.     Second, when Tangoe acquired a company, it tried to sell the Core Subsidiary's products to the acquired company's customers, and it tried to sell the acquired company's products to the Core Subsidiary's customers. Such transactions are just opposites: in both cases, a

---

[1] References to "Q_ 201_" are to references to Tangoe's fiscal quarters. Reference to "Q1 2011," for example, are to Tangoe's first quarter of 2011 -- January 1, 2011, to March 31, 2011.

company's subsidiary is selling its product to another of the company's subsidiaries' customers. Thus, if Tangoe attributes revenues to its Core Subsidiary when the Core Subsidiary sells its products to the acquired company's customers, it should attribute revenues to the acquired company when the acquired company sells its products to the Core Subsidiary's customers. But Tangoe attributed the revenues to its Core Subsidiary in both cases.

14.     And third, when Tangoe acquired a company, it immediately started to "migrate" that company's clients to its own platform. When it completed the migration, the acquired company would continue to service the clients, but Tangoe would attribute revenues from these clients to its Core Subsidiary.

*Tangoe's improper revenue attribution rules*

| Revenue source: | Attributed to: | Serviced by: |
| --- | --- | --- |
| Contracts in the acquired company's pipeline, but where the acquired company had not begun performance | Core Subsidiary | Acquired company |
| Acquired company's product sold to existing Tangoe customers | Core Subsidiary | Acquired company |
| Tangoe's product sold to acquired company's customers | Core Subsidiary | Core Subsidiary |
| Migrated customer | Core Subsidiary | Acquired company |
| Unmigrated acquired company's customer, for sales only of the acquired company's products | Acquired company | Acquired company |

15.     Hence, the only revenues that Tangoe attributes to the acquired companies were sales of that company's historical products to that company's historical customers[2] and even those

---

[2] Except if the acquired company independently generates a new sale for a new customer that is not also a customer of Tangoe.

only until the customers were migrated to Tangoe's platform. Thus, Tangoe would attribute to the Core Subsidiary essentially all of the acquired companies' revenue growth; as Tangoe was completing the migration, it would begin to attribute even the acquired companies' existing revenues to the Core Subsidiary.

16.      Tangoe never met its organic growth target -- it never grew by 20% year-over-year[3] in any fiscal quarter or year of the Class Period (or, for that matter, to date). Nonetheless, for most quarters during the Class Period, Defendants made public statements to investors that Tangoe's organic growth numbers that exceeded 20%, and sometimes that they were as high as 28%. Defendants also regularly provided to investors materially understated estimates of the acquired companies' contributions to Tangoe's revenues.

17.      Defendants were aware that Tangoe was misleadingly attributing revenues to the Core Subsidiary. Every week, Tangoe circulated a memorandum to its senior management. The memorandum set out every single major contract which either had recently been executed or was being negotiated. For each contract, the memorandum provided expected revenues, the salesperson responsible for the contract, and the salesperson manager. According to Josh Guyotte, who received the memorandums and attended the calls, they made it obvious that Tangoe was "gobbling up" the revenues generated by the companies it acquired. Defendants Albert Subbloie and Gary Martino were among the senior management who received the memorandums, and they attended the hour-long weekly conference call to discuss them.

18.      Because Tangoe represented that its business plan was working – that it was generating more than 20% organic growth during fiscal years 2011-2012 -- Tangoe was able to

---

[3] Year-over-year growth measures revenues for a period against the previous year's corresponding period. Thus, for example, to determine year-over-year growth of the first quarter in 2012, that quarter's revenues are measured against revenues in the first quarter of 2011.

sell about a hundred million dollars of its shares. Tangoe itself received net proceeds of $87.7 million in its IPO, and another $38.5 million in a follow-on offering taking place in March 2012. Similarly, Defendant Subbloie sold $5.4 million of his shares, and Defendant Martino $1.8 million. And Golding, a general partner of Edison Venture Fund (Tangoe's principal financial backer) caused Edison sell all its shares during the Class Period – *for about $80 million*.

19.     This is not the first time the individual defendants committed securities fraud. Subbloie and Martino were the CEO and CFO of Information Management Associates ("IMA"), which was even backed by Edison Ventures. Subbloie and Martino issued a press release touting IMA's revenue, which was overstated by 25%. IMA's stock price leapt and Edison Ventures sold over a million dollars of its IMA shares. Over the next year, IMA was forced to reveal that the revenues were invented and investors suffered losses. IMA, Subbloie, and Martino paid a much higher percentage of investors' losses than is usual to settle the claims against them, reflecting the claims' strength. They did not even wait for a decision on their motion to dismiss.

20.     On August 28, 2012, analyst firm thestreetsweeper.org published a report calling attention to the fact that Tangoe's growth strategy was driven by risky acquisitions, which it explained was inherently vulnerable to accounting fraud. On this news, Tangoe shares declined about $3.39 to $16.70, or 17%.

21.     On September 6, 2012, analyst firm Copperfield published a report showing that Tangoe "has significantly misrepresented its de novo [i.e., organic] growth rate." On this news, Tangoe's stock price fell $2.71 to $14.29 between September 6 and 7, or about 15.9%.

22.     On September 10, 2012, analyst firm Wedbush Securities confirmed that Tangoe had overstated its organic growth, concluding that the truth lay somewhere between Copperfield's numbers and Tangoe's, that Tangoe's disclosures concerning organic growth had

been misleading, and that Tangoe had sucked up the acquired companies' revenues and misleadingly called it organic growth.

23.     When Defendants' statements were shown to be misleading, Tangoe's stock price lost the artificial inflation the statements had created, damaging investors.

## II. **JURISDICTION AND VENUE**

24.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

26.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa  and 28 U.S.C. § 1391(b) as Tangoe's principal place of business is located within this District.

27.     In connection with the challenged conducts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## III. **PARTIES**

28.     Plaintiff Lewis Stein, as set forth in his previously filed Certification, purchased Tangoe common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and misleading statements and/or material omissions alleged herein.

29.     Defendant Tangoe is a Delaware corporation with principal executive offices

located at 35 Executive Boulevard, Orange Connecticut.  Tangoe's common stock trades on the NASDAQ Stock Market ("Nasdaq") under the ticker symbol "TNGO."

30.     Defendant Albert R. Subbloie Jr. ("Subbloie") was, at all relevant times, the Company's Chairman of the Board of Directors ("Board"), President and Chief Executive Officer, and sold 408,307 shares of the Company's common stock during the Class Period for proceeds of approximately $5.4 million. Defendant Subbloie signed and authorized each of Tangoe's quarterly and annual financial statements, its registration statements, and participated in each of Tangoe's earnings conferences with investors.

31.     Defendant Gary R. Martino ("Martino") was, at all relevant times, the Company's Chief Financial Officer, and sold 130,835 shares of the Company's common stock during the Class Period for proceeds of approximately $1.8 million. Defendant Martino signed and authorized each of Tangoe's quarterly and annual financial statements, its registration statements, and participated in each of Tangoe's earnings conferences.

32.     Defendants Subbloie and Martino received weekly detailed memorandums which informed them of all pending and closed contracts through which Tangoe expected to earn revenues. Each weekly memorandum included two lists, one for pending contracts and one for closed contracts, and each provided the customer's name, the revenue involved, the sales representative, the sales manager, the date of the contract, and whether the contract had closed or was still pending. Defendants Subbloie and Martino then also participated in a weekly Monday-afternoon conference call to discuss the memorandums. Josh Guyotte recalls Defendants Subbloie and Martino making comments on these Monday-afternoon calls.

33.     Defendant Gary P. Golding ("Golding") was, at all relevant times, a director on the Company's Board, and caused to be sold 5,045,271 shares of the Company's common stock

during the Class Period for proceeds of approximately $80.8 million.  Defendant Golding signed

the Registration Statement. Golding is a general partner of Edison Ventures Fund, and as director

represents Edison on Tangoe's board.

34.     The Defendants referenced above in ¶¶30-33 are collectively referred to herein as

the "Individual Defendants."

## IV. DEFENDANTS MAKE MISLEADING STATEMENTS TOUTING TANGOE'S ORGANIC GROWTH

35.     Throughout the Class Period, Defendants made the following misleading

statements about Tangoe's organic growth:

a.   They claimed that Tangoe's organic recurring revenue growth rate for the second
quarter and first half of 2011 were 28% each, implying that Tangoe's organic
growth rate in the first quarter of 2011 was 28%.

b.   They claimed that Tangoe's organic recurring revenue growth rate for the third
quarter of 2011 was greater than it was in Q2, 2011, and thus greater than 28%;

c.   They claimed that Tangoe's organic recurring revenue growth rate for the fourth
quarter of 2011 was in the "mid-20% range".

d.   They claimed that Tangoe's organic recurring revenue growth rate for the first
quarter of 2012 was "in the low to mid-20% range".

e.   They claimed that Tangoe's organic recurring growth rate for the second quarter
of 2012 was "in the low-to-mid 20% range".

| Time period | Statement | Speaker(s) | Source |
|---|---|---|---|
| Q1 2011 | 28% organic growth (implied, from 28% half and Q2) | Martino | Q2 earnings conference call, 2011-08-23 |

| Q2 2011 | 26 million revenue 28% organic growth | Subbloie, Martino | Q2 earnings conference call, 2011-08-23 |
| Q3 2011 | Not provided, but did not correct analyst who said that organic growth was as high or higher than Q2 2011 | Subbloie,  Martino | Q3 earnings conference call, 2011-11-08 |
| Q4 2011 | "In the mid-20% range" (Martino); "same ballpark of 25% growth" (Subbloie, agreeing with analyst) | Subbloie,  Martino | Q4 earnings conference call, 2012-02-15 |
| Q1 2012 | "Low to mid 20% range" | Martino | Q1 earnings conference call, 2012-05-08 |
| Q2 2012 | "Low to mid 20% range" | Martino | Q2 earnings conference call, 2012-08-08 |

36.     Similarly, Tangoe provided estimates of most of the acquired companies'
revenues:

| Time period | REVENUE AMONT | Filing | Signatories |
| --- | --- | --- | --- |
| Q1 2011 | $2.9 million ($0.4 million (Telwares) + $2.5 million (HCL) (F-17-18) | Registration statement (July 21, 2011) | All defendants |
| Q2 2011 | $5.0 million ($2.6 million (Telwares) + $2.4 million (HCL)) | Q2 10-Q | Martino; Subbloie |
| Q3 2011 | $6.9 million ($2.5 million (Telwares) $4.4 million (HCL)) | Q3 10-Q | Martino; Subbloie |
| FY 2011[4] | $20.7 million ($7.9 million (Telwares) + $12.3 million (HCL) + 0.5 million (ProfitLine)) | Registration Statement | All defendants |

---

[4] Tangoe never provided ProfitLine's contribution to Tangoe's revenues in its SEC filings.

Implied organic growth rate:

| Time period | Previous year equivalent period revenue | Revenue increase | Revenue increase minus revenue attributed to acquired companies | Implied growth rate[5] |
|---|---|---|---|---|
| Q1 2011 | $16.0 million | $6.3 million | $3.4 million | 21.2% |
| Q2 2011 | $16.7 million | $9.3 million | $4.3 million | 25.7% |
| Q3 2011 | $17.1 million | $10.2 million | $4.8 million | 28.1% |
| FY 2011 | $68.5 million | $36.5 million | $16.6 million | 24.2% |

37.    These statements were misleading because they overstated the proportion of

Tangoe's revenue growth which is organic:

---

[5] The growth rate estimated in Tangoe's conference calls differs slightly from those in Tangoe's conference calls because on the conference calls, Defendants were estimating Tangoe's recurring revenue organic growth rate. The SEC filings also include Tangoe's historical business.

a.  As explained below in ¶¶38-85, Defendants and Tangoe misattributed revenues derived from the subsidiaries to its own operations: (1) when Tangoe acquired them Telwares and HCL each had between $1-1.5 million (and ProfitLine $2-3 million) in revenues in the pipeline, which revenues Tangoe attributed to its Core Subsidiary; (2) whenever Tangoe sold its existing clients the acquired company's product, Tangoe attributed the revenues to its Core Subsidiary; (3) whenever Tangoe sold the acquired company's clients its own products, Tangoe attributed the revenues to its Core Subsidiary; and (4) when Tangoe completed migrating a client to Tangoe's platform, it attributed all subsequent revenues to its Core Subsidiary.

b.  As explained in ¶¶86-106, as Tangoe's revenues nearly doubled over the Class Period, Tangoe's deferred revenues did not grow apace. Tangoe's Core Subsidiary generates large deferred revenue balances, while the companies Tangoe acquired generate few deferred revenues. Thus, had Tangoe's growth arisen from its Core Subsidiary, it would have generated deferred revenues. That Tangoe's deferred revenues barely increased is evidence that its growth was simply driven by the acquired companies.

c.  As explained below in ¶¶72-85, Tangoe stated, and its estimates of organic growth require, that HCL, Telwares, and ProfitLine had significantly lower revenues the year after they were acquired. But the revenues of both ProfitLine and Telwares, at least, were either stable or increasing. Thus, its statements of organic revenue growth were false.

17

## V.  WITNESSES WITH PERSONAL KNOWLEDGE

38.    BECKY THOMPKINS was an Account Manager for Telwares between 2010 and Tangoe's acquisition of Telwares in March 2011.  In that capacity, Ms. Thompkins managed customer accounts. She continued with the same job tasks post-acquisition, until approximately June 2012.  When Tangoe acquired Telwares, Ms. Thompkins was responsible for all Telwares customer accounts. Ms Thompkins states that the migration of Telwares customers to Tangoe started soon after a June 2011 meeting in which Subbloie said Tangoe would "eat up the competition."

39.    HUGH ROGER was the Director of Operations at Telwares from February 2008 until Tangoe acquired Telwares in March 2011. He was in charge of running Telwares's invoice processing system and its revenue tracking system, and had over 60 Telwares employees reporting to him. Post-acquisition, Tangoe retained him as a consultant. In that capacity, he maintained his previous responsibilities, as well as responsibility for shifting clients to Tangoe's client management software platform, Invoice Processing Systems ("IPS"). He remained employed by Tangoe as a consultant from March 2011 until January 2012.  Roger reported to the COO of Telwares.  At Tangoe, he reported to Don Farias, Tangoe's Senior Vice President.

40.    GINA OSTER was the Vice President of Finance and Corporate Controller at ProfitLine from November 2007 to December 2011. When Tangoe acquired ProfitLine, she was terminated from her position, but continued to work for Tangoe as a consultant from December 2011 until May 2012, where she reported to Tom Beach, Vice President of Finance at Tangoe.

41.    As controller and then as a consultant, Ms. Oster was responsible for keeping ProfitLine's financial accounts and generating its financial statements. After the acquisition, she

18

prepared end-of-month financial statements of ProfitLine's financial accounts, including calculating revenues, and reported them to Tangoe's Finance Department at the end of each month. She signed off on ProfitLine's financial records, and had complete access to them. She was provided with historic ProfitLine (with sales by clients) and would forecast sales out to the end of the year.

42.    JOSH GUYOTTE was the Director of Mobile Sales at Tangoe, Inc., from August 2009 to November 2012, when he resigned. He led a sales force in the Management Division of Tangoe, and closed about $10 million in sales.

43.    Every week, Mr. Guyotte received a memorandum which listed all the pending and recently closed contracts at Tangoe. For every contract, the memorandums provided (a) the salesperson responsible, (b) the salesperson's manager, and (c) the total revenue expected from the contract. Guyotte then attended the hour-long conference call Tangoe held every Monday afternoon to discuss the weekly memorandums. Subbloie and Marino frequently attended, and Guyotte remembers that they made comments during the calls.

44.    The weekly memorandums made clear to Guyotte that Tangoe was "gobbling up" the acquired companies' revenues and improperly attributing them to Tangoe's Core Subsidiary.

45.    Guyotte recalls that he was skeptical concerning Subbloie and Martino's claim that Tangoe's organic growth rate was above 20% (he still is skeptical to this day). Guyotte adds that "I always chuckled when I heard [] Subbloie telling investors we were growing 20%. It seemed a little fishy. The numbers seemed a little off."

46.    CHADD BENNETT was a Director of Account Management at Tangoe between February 2011 and 2012, having previously been an employee of HCL.

47.    When he was a Tangoe employee, Bennett's job was to sell Tangoe's products to

19

existing HCL clients.

48.     Bennett recalls that when he and his colleagues would hear Subbloie tell investors that Tangoe was experiencing 20% organic growth, they laughed. He adds:

> There was no organic growth. It was all game bought. His numbers were a joke. We sat there and laughed. Where did that organic growth come from? All the acquisitions.

## VI. TANGOE OVERSTATES ITS ORGANIC GROWTH

A.     *Investors understood "organic growth" to refer to growth in Tangoe's Core Subsidiary, not to the growth obtained by shifting existing customers into the Core Subsidiary.*

49.     Both "organic" and "inorganic" growth have accepted definitions in the business community. The definition of organic growth is growth generated by the company's existing business. The definition of inorganic growth is growth generated by acquiring existing businesses.

50.     Organic growth is measured by taking the company's revenue growth and subtracting the effects of acquisitions.

51.     Hence, when Defendants referred to Tangoe's organic growth, investors reasonably believed that Defendants was referring to Tangoe's own growth and excluding growth generated by acquisitions.

B.     *When it acquires a company, Tangoe takes three steps to "gobble up" its revenues.*

52.     Between January 2011 and February 2012, Tangoe acquired five companies: HCL, Telwares, ProfitLine, Anomalous, and ttMobiles.

53.     Of the five companies, HCL, Telwares, and ProfitLine each had more than $10

million in revenue the year before Tangoe acquired them. ttMobiles had $6 million, and Anomalous $1 million.

54.     When it acquires a company, Tangoe begins to "gobble up" the subsidiary's revenues, attributing them to Tangoe's Core Subsidiary:

*Tangoe's improper revenue attribution rules*

| Revenue source: | Attributed to: | Serviced by: |
|---|---|---|
| Contracts in the acquired company's pipeline, but where the acquired company had not begun performance | Core Subsidiary | Acquired company |
| Acquired company's product sold to existing Tangoe customers | Core Subsidiary | Acquired company |
| Tangoe's product sold to acquired company's customers | Core Subsidiary | Core Subsidiary |
| Migrated customer | Core Subsidiary | Acquired company |
| Unmigrated acquired company's customer, for sales only of the acquired company's products | Acquired company | Acquired company |

Step 1: Tangoe attributes all existing contracts on which the subsidiary has not begun to perform to the Core Subsidiary.

55.     HCL ($1-1.5 million), Telwares ($1-1.5 million) and ProfitLine ($2-3 million) each had customers which they had recently signed up, but had not yet begun to service. Tangoe attributed revenues from all these contracts to the Core Subsidiary, though the contracts were serviced by the acquired company.

56.     According to Guyotte, the contracts with the new customers closed within a quarter (at most) of Tangoe's acquiring the companies. In the quarter the new contracts closed, Tangoe put the revenues they generated on the Core Subsidiary's books. Hence, at a minimum, Tangoe artificially boosted its organic growth in the following amounts:

*New customer revenues attributed to the Core Subsidiary*

| Subsidiary | Acquisition date | Quarter overstated | Amount of overstatement | Growth rate after correcting Step 1 misattribution |
|---|---|---|---|---|
| HCL | January 2011 | Q1 2011 | $1-1.5 million | Q1 2011 (15%) |
| Telwares | March 2011 | Q2 2011 | $1-1.5 million | Q2 2011 (19.8%) |
| ProfitLine | December 2011 | Q4 2011 or Q1 2012 | $2-3 million | Unknown |

Step 2: Tangoe attributes any new revenue generated by the acquired companies to the Core Subsidiary.

57.     When Tangoe acquired a company, as Messrs. Roger and Guyotte report, its salespersons would begin calling the acquired company's customers, seeking to sell them Tangoe's other products. The efforts were substantial; Guyotte recalls that his division "always" tried to cross-sell Tangoe's mobile device security to new customers from all the companies Tangoe acquired. Guyette recalls that he would "bundle" the new offerings with the products the customer had already been buying from the acquired company.

58.     Mr. Bennett's job at Tangoe was to sell all of Tangoe's products to various Tangoe customers, including former HCL customers. He began in February 2011. HCL was acquired in January 2011. Hence, for HCL at least, Tangoe began to push to sell Tangoe products to HCL customers on acquisition.

59.     Revenues generated from cross-selling or up-selling sales were attributed to the Core Subsidiary

60.     Defendants have boasted that they tried to sell their whole suite of products to Tangoe's clients, whether they were acquired companies' clients or clients that came with the Core Subsidiary:

*We are also excited about the opportunity to cross-sell and up-sell our broader suite of solutions on our expanded customer base and have successfully*

22

***implemented this strategy with customers such as Fifth Third, AmerisourceBergen, AIG and General Electric among others.*** -Subbloie, Q3 2011 earnings call, 2011-11-08.

***The addition of Anomalous Networks also broadens Tangoe's CLM coverage to include machine-to-machine communication endpoints, extending expense management, asset tracking, and usage control to all types of wireless devices. Anomalous Networks also brings strategic alliances with key carriers as well as additional partnerships with vendors in the managed service, OEM, machine-to-machine and standalone mobile device management solution spaces. We are very excited to add a best-in-class real-time expense management capability to our CLM platform, which we believe will provide another attractive cross-selling opportunity across our large and growing customer base as well as our business partners.***
-Subbloie, Q4 2011 earnings call, 2012-02-15.

***We have had a successful track record of driving strong organic growth as well as integrating acquisitions and cross-selling our suite of solutions and believe our acquisition of ProfitLine further expands Tangoe's market leadership position.***
-Subbloie, conference call to discuss ProfitLine acquisition, 2011-12-19.

>   Step 3: Tangoe migrates the acquired company's customers to its platform, and
>
>   attributes revenues from those clients to the Core Subsidiary.

61.   After it acquired a company, Tangoe immediately began to migrate customers from the acquired company to its platform.

62.   Mr. Guyotte reports that once a client was migrated, Tangoe attributed revenues from that client to the Core Subsidiary.

63.   Mr. Roger reports that Telwares prepared its financial statements for Tangoe's use after Tangoe acquired it. Mr. Roger reports that Telwares was not provided with revenue numbers from the acquired companies. Thus, Mr. Roger reports, the financial statements Telwares prepared did not list revenues from migrated customers.

64.   As to Telwares, Mr. Roger reports that migrated customers would face a platform which "presented differently," but would receive essentially the same service.

65.     Defendants Subbloie and Martino extensively discussed migrations in each of Tangoe's conference calls,[6] but both they and Tangoe omitted to disclose that Tangoe attributed revenues from migrated clients to the Core Subsidiary. For example, in discussing Tangoe's acquisition of ProfitLine, Martino said:

> **So in summary, we are very excited about the acquisition. Tangoe has a successful track record of integrating acquisitions; migrating customers on to our platform and cross-selling our suite of solutions, which we expect to translate to additional organic growth opportunities longer term.** -Martino, Conference Call to discuss ProfitLine acquisition, 2011-12-19.

66.     Defendant Martino omitted to state that migration itself would, through ProfitLine's revenue attribution rules, be the main driver of organic growth, as revenues arising from any customer who would be "migrated" would be considered revenues of the Core Subsidiary.

67.     In sum, Tangoe's revenue attribution rules ensure that virtually all new revenue sgenerated by the acquired companies, and then the revenues themselves, will be attributed to the Core Subsidiary. According to Josh Guyotte, these rules permit Tangoe to "gobble up" the acquired companies' revenues.

C.     *Tangoe understates the post-acquisition revenues of the companies it acquires, and thus overstates the core subsidiary's revenues and its organic revenue growth.*

HCL

68.     On January 25, 2011, Tangoe acquired HCL Expense Management Services Inc. ("HCL"), a provider of telecommunications expense management, invoice processing and

---

[6] Q2 earnings conference call, 2011-08-23; Q3 earnings conference call, 2011-11-08; Q4 earnings conference call, 2012-02-15; Q1 earnings conference call, 2012-05-08; Q2 earnings conference call, 2012-08-08.

mobility management solutions, for approximately $3 million in cash plus potential earnout payments of $3.4 million.

69.     According to Josh Guyotte, HCL had $1-1.5 million in revenues in its pipeline when Tangoe acquired it. Immediately following the acquisition, Tangoe attributed all of this revenue to Tangoe's Core Subsidiary in order to artificially generate "organic" growth. Guyotte adds that when Tangoe acquired companies that had signed contracts with clients without having begun performing on the contract, Tangoe always attributed revenues from those clients to its own Core Subsidiary, though the acquired company serviced the contracts.

70.     Mr. Guyotte was personally involved in these efforts, as he, his staff, and others at Tangoe were instructed to call an acquired company's customers to sell them Tangoe's other products. He understood that the revenue earned from such sales would be recognized as Tangoe's "organic" revenue.

71.     Once Tangoe had finished migrating a customer from HCL to Tangoe's platform Tangoe attributed revenues earned from servicing that client -- including revenues earned from providing that client with the services it had previously obtained through HCL -- to Tangoe's Core's Subsidiary.

Telwares

72.     On March 16, 2011, Tangoe acquired a part of Telwares, Inc. and its subsidiary Vercuity Solutions, Inc. (collectively, "Telwares"), for approximately $4.5 million in cash plus deferred cash of up to $2.5 million.

73.     According to Tangoe, Telwares earned $10.6 million in the year before Tangoe acquired it, and $10.1 million in the year Tangoe acquired it.

74.     Prior to Tangoe's acquisition, Telwares had two businesses: a consulting arm, and

25

a client management arm called "TEMS". Tangoe acquired TEMS.

75.     TEMS audits clients' phone bills, negotiates specific entries, and then pays (after client approval) the clients' bills from an account in which the client deposited funds.

76.     In the years before 2010, Telwares's client consulting arm had prospered while its client management side had stagnated. Then, by 2010, Telwares pared down costs, eliminated redundancies, improved its product, and leveled off attrition. The improvements were substantially complete by the end of 2010, when TEMS started carrying Telwares's business, and in early 2011, shortly before it was acquired by Tangoe, TEMS recruited several major new clients. The projected revenues from those clients were placed in TEMS's pipeline prior to the acquisition.

77.     When Tangoe acquired TEMS in March 2011, one of the things it ordered TEMS to do was prepare its financial statements for Tangoe's use. Telwares would then generate the financial statements from the information that was available to it. Though it serviced them, Tangoe was not provided revenue information for the following categories of customers: (a) revenues from the pipeline clients; (b) revenues from migrated customers; and (c) revenues from other Tangoe clients who had bought Telwares's products. Thus, the financial statements Telwares compiled for Tangoe's use did not include revenues from migrated customers, upsold customers, or the new TEMS customers which Tangoe had appropriated. Guyotte confirms that all such revenues were attributed to Tangoe's Core Subsidiary, and adds that Tangoe always attributed revenues to the Core Subsidiary exactly as it did with Telwares.

ProfitLine

78.     Tangoe acquired ProfitLine on December 19, 2011. ProfitLine provides telecom expense and mobility management services. For ProfitLine, Tangoe paid about $23.5 million,

$14,500,000 in cash due immediately, and $9,000,000 in cash installments of $4,5000,000 payable on December 19, 2012, and June 19, 2013, subject to set-offs.

79.    When Tangoe acquired ProfitLine, it gave guidance for ProfitLine's 2012 revenues of $14-15 million. In Tangoe's Q1 2012 earnings conference call, Martino said Tangoe was "still in line with the guidance [it] had provided."

80.    On February 15, 2012, Tangoe held its conference call for the fourth quarter of 2011. Tangoe revealed that it had booked $500,000 in revenue from ProfitLine between December 19 and 31, 2011. On March 5, 2012, Tangoe revealed that ProfitLine's revenues between January 1 and December 19, 2011, were $16.9 million (of which $16.8 million were recurring). Thus, these two disclosures show that ProfitLine's 2011 revenues were $17.4 million.

81.    Hence, Tangoe's guidance implies that ProfitLine's revenues would fall by $2.4-$3.4 million in 2012, or 13.8-20.0% -- a catastrophic decline for a single year.

82.    Gina Oster's job was to keep Tangoe's books, generate its financial statements, and make forecasts of its revenues.

83.    According to Ms. Oster, ProfitLine's outlook for 2012 (and actual performance until Ms. Oster's termination in May 2012) was for "stable" revenues.

84.    Guyotte reports that when Tangoe acquired it, ProfitLine had about $2-3 million in revenues from clients who had signed contracts that ProfitLine had not begun performing. Tangoe attributed these clients to its Core Subsidiary.

85.    Guyotte adds that Tangoe would, whenever it acquired a company, attempt up-selling and cross-selling. The revenues from all such up-selling and cross-selling revenues were attributed to Tangoe's Core Subsidiary.

27

D.    *Tangoe's Core Subsidiary, unlike the companies Tangoe acquired, generates*
      *deferred revenues. Thus, that Tangoe has not generated more deferred revenues*
      *to keep pace with its revenue growth is evidence that Tangoe is growing by*
      *acquiring revenues rather than by growing its revenues organically.*

86.    About deferred revenue, Tangoe has continually represented that "[w]e monitor our deferred revenue balance as this balance represents revenue to be recognized over the next 12 months [with exceptions not relevant here]."[7] Tangoe adds that it monitors several aspects of its deferred revenue, including implementation fees which it charges customers at inception and recognizes throughout half the life of the contract.

87.    Deferred revenue is an item on a balance sheet for revenues that have been invoiced but have not yet been earned. Under Generally Accepted Accounting Principles ("GAAP"), revenue must be *earned* before it can be recognized. Deferred revenues are revenues that have been invoiced but that a company cannot yet recognize, because it has not yet earned them. For example, if Tangoe sells a client a license to use its platforms for the year beginning January 2014 and invoices the client for the entire service in December 2013, Tangoe will have deferred revenues for the whole amount of the bill at the moment it invoices the customer. Throughout 2014, Tangoe will recognize the deferred revenues ratably. Once they are recognized, deferred revenues will simply be revenues, diminishing Tangoe's deferred revenue balance. Whether the customer pays the entire invoice in December 2013 (or at any time thereafter) has no impact on whether Tangoe can create a deferred revenue entry in 2013, or on when in 2014 it can recognize the deferred revenues.

---

[7] E.g.S-1/A, filed July 21, 2011, at 44; Prospectus, filed July 27, at 43; 10-K for the period ending December 31, 2011, at 44.

88.     Except Anomalous, which only contributed $1.2 million to Tangoe's revenues in 2012, none of the companies Tangoe acquired generate significant deferred revenues:

a.   When HCL was acquired, it had earned $18.0 million in the previous year, and had deferred revenues of $119,000 -- or about 0.6%.

b.   According to Roger, Telwares/TEMS was paid either a flat fee or as a percentage of the bills paid. It earned its revenues when, *after* completing work for the client, it invoiced the client. Thus, as confirmed by Roger, except in exceptional circumstances, TEMS generates *no* deferred revenues, because then it *never* bills in advance. And Telwares' financial statements show that when Tangoe acquired it, it had $68,000 in deferred revenues from its $10.6 million in revenues -- about 0.64%.

c.   ProfitLine was acquired in mid-December 2011. In 2011, ProfitLine earned $17.4 million, and its deferred revenue balance at acquisition was $152,000 on revenues of $17,419,000 -- 0.9%.

d.   In the year they were acquired, Anomalous generated $370,000 on $1.2 million in revenues, and ttMobiles generated $620,000 on revenues of $6.5 million.[8]

When ttMobiles was acquired, it had deferred revenues of $620,000 against 2011 revenues of $6,471,000.

---

[8] Because the acquisitions were not material, Tangoe never provided financial statements for Anomalous and ttMobiles for the year prior to their acquisition. Anomalous was acquired February 21, 2012, and Tangoe reported that it earned $1.2 million in 2012. ttMobiles was acquired on February 21, 2012, and Tangoe recorded revenue of $5.6 million from that date until December 31, 2012. Both revenue figures were annualized.

| *Deferred revenues of the acquired companies* | | |
|---|---|---|
| *In thousand dollars* | Annual | Deferred |
| Acquired Companies[9] | revenue | revenue |
| | $ | |
| HCL | 18,042 | $119 |
| Telwares | 10,606 | 68 |
| ProfitLine | 17,419 | 152 |
| Anomolous | 1,000 | 370 |
| ttMobiles | 6,544 | 26 |
| | $53,811 | $735 |

Deferred revenue as a % of annual revenue = 1.4%

---

[9] Where available, the deferred revenue in this table was taken from the subsidiaries' previous-years' financial statements which Tangoe filed alongside its own financial statements.

89.     Tangoe's Core Subsidiary, however, generates significant deferred revenues. Tangoe's recurring technology and services revenue will generate deferred revenue when they are billed in advance.  As is common in the industry, many components of Tangoe's recurring technology and services revenue are billed in advance. For example, subscription-based fees, software subscription license fees, software maintenance fees and hosting fees are for services used over a period of time.  The amounts are billed in advance so that customers pay for the service before it is provided.  Once the service period expires the customer has less incentive to pay for the service that it has already used. In fact, Tangoe disclosed that it invoices its services to "many of [its] customers in advance, with intervals ranging from 1 to 12 months."[10]

90.     If billed in advance, the entire amount of the bill is initially recorded as deferred revenue, recognizing the obligation to provide those services in the future.

---

[10] 2011 Form 10-K, p. 44.

31

It is extremely unlikely that Tangoe could double the revenues of the Core Subsidiary without generating significant increased deferred revenues.

91.    Tangoe recognizes its deferred revenue ratably over the period of service.[11] Therefore, if amounts are billed to the customer one month in advance, then Tangoe recognizes the deferred revenue as revenue during that next month as the service is provided.  Likewise, if revenue is billed in advance for a 12-month period, then Tangoe will recognize $1/12^{th}$ of the deferred revenue in each of the following 12 months.

92.    Between December 31, 2010 until June 30, 2012, Tangoe reported deferred revenue in the following amounts:

| ($000s) | Q4 '10 | Q1 '11 | Q2 '11 | Q3 '11 | Q4 '11 | Q1 '12 | Q2 '12 |
|---|---|---|---|---|---|---|---|
| **Deferred Revenue:** | | | | | | | |
| (Actual) | | | | | | | |
| Current | 8,304 | 8,973 | 8,492 | 9,252 | 9,051 | 9,457 | 9,470 |
| Long-term | 1,788 | 2,036 | 2,036 | 2,483 | 2,624 | 2,274 | 1,889 |
| Total | 10,092 | 11,009 | 10,528 | 11,735 | 11,675 | 11,731 | 11,359 |
| Cumulative change in total deferred revenue | -- | 917 | 436 | 1,643 | 1,583 | 1,639 | 1,267 |

The cumulative change in deferred revenue is calculated as the deferred revenue at the end of any quarter less the deferred revenue at December 31, 2010.

---

[11] 2011 Form 10-K, at p. 81. GAAP requires no less.  For example, if an arrangement is in substance a subscription, the entire fee shall be recognized ratably.  ASC 985-605-25-10. Additionally, GAAP requires that the fees for additional services such as implementation fees, training or consulting be either recognized as the services are performed or on a straight-line basis over the period during which the services are performed, including over the estimated life of the customer relationship.  Tangoe accounted for its implementation fees over the period of the customer relationship.  ASC 985-605-25-76 to 80.

93.     From Q4 2010 to Q2 2012, using trailing 12-months revenue to correct for seasonality, Tangoe's revenues grew by $58.5 million, from $68.5 million to $127.0 million, or approximately 85%:

| ($000s) | Q4 '10 | Q1 '11 | Q2 '11 | Q3 '11 | Q4 '11 | Q1 '12 | Q2 '12 |
|---|---|---|---|---|---|---|---|
| **Trailing 12 months revenue:** | | | | | | | |
| Recurring technology & services | 57,703 | 64,370 | 73,989 | 83,875 | 93,671 | 104,500 | 113,065 |
| Strategic consulting, software licenses and other | 10,771 | 10,490 | 10,213 | 10,501 | 11,270 | 12,247 | 13,892 |
| Total | 68,474 | 74,860 | 84,202 | 94,376 | 104,941 | 116,747 | 126,957 |

94.     Recurring technology and services revenue nearly doubled during that same period, growing by approximately 96%, or $55.4 million.

95.     If all revenue is billed one month in advance, then Tangoe's deferred revenues should increase by a third of the quarterly increase in revenues. This is because a quarter includes three months' revenues, and on average, at any one time, Tangoe will have invoiced one month's worth of revenues early. Thus, the following table shows the quarter over quarter growth in trailing twelve months revenue:

| ($000s) | Q1 '11 | Q2 '11 | Q3 '11 | Q4 '11 | Q1 '12 | Q2 '12 |
|---|---|---|---|---|---|---|
| **Change in trailing 12 months revenue:** (QoQ) | | | | | | |
| Recurring technology & services | 6,667 | 9,619 | 9,886 | 9,796 | 10,829 | 8,565 |
| Strategic consulting, software licenses and other | -281 | -277 | 288 | 769 | 977 | 1,645 |
| Total | 6,386 | 9,342 | 10,174 | 10,565 | 11,806 | 10,210 |

These amounts are calculated as the trailing twelve months revenue at the end of the quarter less the trailing twelve months revenue at the end of the previous quarter.

33

96.    The table below shows the implied increase in deferred revenue, calculated as one-third of the amounts in paragraph ¶95.

| **Implied change in deferred revenue:** (1/3 of above) | | | | | | |
|---|---|---|---|---|---|---|
| Recurring technology & services | 2,222 | 3,206 | 3,295 | 3,265 | 3,610 | 2,855 |
| Strategic consulting, software licenses and other | -94 | -92 | 96 | 256 | 326 | 548 |
| Total | 2,129 | 3,114 | 3,391 | 3,522 | 3,935 | 3,403 |

97.    The implied change in deferred revenue is the change in trailing twelve months revenue divided by three.  That is because the change in trailing twelve months revenue is the change in annual revenue during the quarter, or a three-month period.

98.    Deferred revenue is a balance sheet account and the amounts roll forward each quarter or are added together as each quarter passes. Since the revenue keeps growing each quarter, each quarterly increase in revenue should contribute proportionally to an increasing amount of deferred revenue. The implied increases in deferred revenue are shown in the following table:

| ($000s) | Q1 '11 | Q2 '11 | Q3 '11 | Q4 '11 | Q1 '12 | Q2 '12 |
|---|---|---|---|---|---|---|
| **Cumulative implied change in deferred revenue:** | | | | | | |
| Recurring technology & services | 2,222 | 5,429 | 8,724 | 11,989 | 15,599 | 18,454 |
| Strategic consulting, software licenses and other | -94 | -186 | -90 | 166 | 492 | 1,040 |
| Total | 2,129 | 5,243 | 8,634 | 12,156 | 16,091 | 19,494 |

99.     Thus, Tangoe's growth in recurring technology and services alone should have caused an increase of $18.5 million in Tangoe's deferred revenues. But Tangoe's deferred revenues only increased by $1.3 million. The table below shows the implied shortfall in deferred revenue for each quarter.

| | Q1 '11 | Q2 '11 | Q3 '11 | Q4 '11 | Q1 '12 | Q2 '12 |
|---|---|---|---|---|---|---|
| **Implied shortfall in deferred revenue** | | | | | | |
| Recurring technology & services | 1,553 | 5,241 | 7,776 | 11,242 | 14,446 | 17,288 |

100.     It is true that Tangoe has not specified what percentage of the Core Subsidiary's revenues are billed in advance. However, to increase deferred revenues by only $1.3 million, Tangoe would have had to invoice less than 6% of its revenues in advance. And, moreover, Tangoe also states that it  "invoice[s] [its] services to many of [its] customers in advance, with the intervals ranging from 1 *to 12 months*" (emphasis added). Any increase in the term would cause a proportional increase in deferred revenues. For example, a contract invoiced two months in advance will create twice as much deferred revenues as a contract invoiced one month in advance, and a contract invoiced twelve months in advance will generate twelve times as much deferred revenues. And Tangoe's SEC filings suggest that a substantial proportion of Tangoe's deferred revenues are invoiced for substantially more than one month. They say "[w]e monitor our deferred revenue balance as this balance represents revenue to be recognized *over the next 12 months*"[12] which would be misleading if substantially all deferred revenues were invoiced only a month in advance.

101.     This analysis also assumes that Tangoe's core continuing business is treated in the financial statements in the same or similar manner that it was treated prior to its acquisition spree in 2010 and 2011.  Since there is no disclosure to suggest any change in the Company's policy with respect to billing intervals or substantial changes in the nature of its business mix, the Core Subsidiary will generate similar levels of revenue, cash flows and deferred revenue over that period.

---

[12] E.g. 2011 10-K, at 44 (emphasis added).

That Tangoe did not generate deferred revenues is evidence that Tangoe grew its revenues by acquiring its subsidiaries, since the companies Tangoe acquired did not generate significant deferred revenues.

102.    Tangoe acquired five companies between January 2011 and June 30, 2012.[13] Other than Anomalous (which did not have a significant impact on Tangoe's deferred revenues balance), no acquired company generated significant deferred revenues in the course of earning revenues.   In addition, the amount of deferred revenue attributable to those companies is $0.735 million, or approximately 2.1% of annual revenue:

| *Deferred revenues of the acquired companies*  *In thousand dollars* Acquired Companies[14] | Annual revenue $ | Deferred revenue |
|---|---|---|
| HCL | 18,042 | $119 |
| Telwares | 10,606 | 68 |
| ProfitLine | 17,419 | 152 |
| Anomolous | 1,000 | 370 |
| ttMobiles | 6,544 | 26 |
|  | $53,811 | $735 |

Deferred revenue as a % of annual revenue = 1.4%

---

[13] Tangoe also acquired a division from Symphony Teleca Services, Inc., on August 8, 2012. None of the Class Period financial statements discussed or relied upon in this Complaint included that division's financial results.

[14] Where available, the deferred revenue in this table was taken from the subsidiaries' previous-years' financial statements which Tangoe filed alongside its own financial statements.   The annual revenue was taken from those same filings and annualized.   Tangoe reported the amount of revenue related to the acquired company that was included in its operations from the time of acquisition.   This amount was then annualized in order to arrive at the annual revenue reported in the table above.

37

103.    Tangoe's Core Subsidiary generates copious deferred revenues. Thus, had Tangoe's Core Subsidiary increased its own sales organically, Tangoe would have generated copious additional deferred revenues. But Tangoe generated few additional deferred revenues. Therefore, Tangoe's Core Subsidiary did not generate growth organically.

104.    But Tangoe's acquired companies do not generate copious additional deferred revenues. Other than Anomalous (whose revenues were negligible), the companies Tangoe acquired produce few deferred revenues from their sales. Hence, the most likely explanation for Tangoe's failure to generate deferred revenues is that it was increasing revenues simply because the companies it acquired provided it with additional revenues. Thus, the approximate doubling of revenues during the period from January 1, 2011 to June 30, 2012 is mostly attributable to the acquired companies.

105.    Tangoe provides several purported excuses to explain the fact that its deferred revenues have scarcely grown even though Tangoe claims its revenues First, Tangoe states that because it predominantly bills monthly, new sales do not contribute much of anything to deferred revenues.[15] And, second, Tangoe argues that it still has deferred revenue relating to historical contracts from its pre-2007 legacy business, which included maintenance on the software Tangoe sold.

---

[15] E.g. Q2 2011 earnings call, 2011-08-23.

106.     For three reasons, this cannot be accurate. First, Tangoe discloses that it invoices "many" clients up to 12 months in advance, which will generate deferred revenues. And the analysis above shows that if it invoices even a small proportion of its contracts in advance, it should have been generating substantially increased deferred revenues, which it has not. Second, Tangoe changed its business model in 2007, and the move was substantially completed by 2009. Since then, it has only "on occasion" sold the perpetual licenses which generate deferred revenues.[16] Thus, the remnants of its old business (maintenance on software sales) should not cause such high deferred revenues. And third, Tangoe's deferred revenues are almost as large as its strategic consulting, software licenses, and other revenues combined.

## VII.   THE FALSE STATEMENTS WERE BOTH MATERIAL AND MADE WITH SCIENTER

A.     *Tangoe's business.*

107.     Tangoe was founded in 2000, and Defendants Subbloie and Martino joined it soon thereafter.

108.     Tangoe's first major investor was Edison Ventures, which invested $3 million in August 2002, and another $5 million before Tangoe's Initial Public Offering in July 2011. Edison had previously profitably invested in Subbloie and Martino's IMA, before IMA collapsed as Subbloie and Martino's fraud was revealed.

109.     Tangoe  purports to provide communications lifecycle management ("CLM") software and services to a wide range of enterprises, including large and medium-sized businesses and other organizations. Tangoe estimates that companies spend $425 billion annually on a wide variety of fixed and mobile communications services sold by a wide variety of

---

[16] E.g. S-1 Registration statement, at 42, filed April 16, 2010.

companies, who issue bills in different formats, in a multitude of jurisdictions, subject to different laws. Tangoe's software, which it dubs its "Communications Management Platform," aims to help the companies receiving these bills navigate some of the complexity this variety brings about by automatically processing billing and order transactions for communication services. Tangoe's software also helps companies identify and resolve billing errors, optimize communications service plans, manage communications assets and services, automate provision of communication assets and services to employees, reduce costs by controlling and allocating communications expenses, and enforce regulatory requirements and internal policies governing the use of communications assets and services.

110.    Tangoe categorizes its revenues into only two sources: *recurring* technology and services, and *one-off* strategic consulting and software licenses. Tangoe earns recurring revenue by selling *periodic* subscriptions to its Communications Management Platform. It earns one-off revenues by consulting for its clients, particularly by negotiating contracts for them, and occasionally by selling *perpetual* licenses to its Communications Management Platform.

111.    At inception, Tangoe was a services company. However, since 2006, when it acquired Traq Wireless, Inc., Tangoe has focused on growing *recurring* technology and services revenues. Tangoe claims that it began to fully realize its recurring revenue model by 2009

B.    *Two of Tangoe's four critical metrics are recurring technology organic revenue growth and deferred revenue.*

Organic revenue growth is a key metric of companies like Tangoe.

112.     In its recurring revenue segment, Tangoe claims to operate as a Software-as-a-Service" ("SaaS") business. Such businesses make software, place it in the cloud, and "deliver" the software to clients by giving the clients access to the software through a subscription-based service. Thus, for example, Westlaw sells users a license to access Westlaw, which users then do on Westlaw's website. The customers pay Westlaw for a license to access its platform.

113.     A key metric of SaaS companies like Tangoe is organic growth. Businesses that deliver SaaS make huge upfront investments to develop software, but can then profitably service new customers at little additional cost, thus scaling profitably. Hence, once a customer is acquired, revenues from that customer are virtually completely profit. If a SaaS business can expand its revenues through organic growth, the business's profits and margins both increase rapidly.

114.     Even money-losing SaaS businesses, provided they are growing, are attractive to investors. The marginal cost of servicing additional customers is minimal; rather, when the business books additional revenue, that additional revenue becomes profit. Thus, it does not cost Westlaw -- or, according to Defendants' claims, Tangoe -- a great deal of money to expand its service to additional clients. Rather, Tangoe's costs, like Westlaw's costs, are largely up-front fixed costs.

115.     Indeed, according to a study of public companies conducted by DH Capital and SaaS Capital, (investment banks focusing on providing funding to SaaS businesses) organic growth is  the  number one driver for SaaS businesses' valuation. The absence of a strong organic growth rate is itself a sign that the business is failing. As they explain:

***There are no public SaaS businesses with growth rates below 20% that have a revenue multiple*** [enterprise value divided by revenues] ***above 3.5***.[17] A 25% level growth rate is a good, bottom of the range, target for emerging private SaaS businesses. Higher growth rates are expected in younger venture backed companies, and lower growth rates are acceptable in more established bootstrapped companies.

[...]

Slow growth SaaS businesses are difficult to get funded a any price. ***These businesses and their existing investors and management must find a way to demonstrate some organic growth that can then be leveraged with additional capital***. Only then will it be worthwhile to investthe time and energy in external fundraising. In a recent conversation with a leading SaaS VC firm they commented "Show me anything that's growing."[18]

[Emphasis added]

116.    Because of Tangoe's seven acquisitions, distinguishing its organic growth from its inorganic growth is for outside investors a key question.

117.    Inorganic growth is less desirable for many reasons:

a.    By acquiring a company, Tangoe also acquires its costs. The companies Tangoe buys are unprofitable (or it would not be able to afford them); thus, Tangoe must figure out a way to incorporate the acquired company's operations while finding a way to cut its cost. According to a recent Harvard Business Review article by Booz & Company senior partner Ken Favaro, most acquisitions do not generate sufficient cost synergies to justify the premium paid for the revenues.

b.    Buying companies is a more expensive way of obtaining new sales than organic growth.

---

[17] Tangoe's revenue multiples for its IPO and secondary offering were, respectively, 4.5x and 7.1x revenue.

[18] SaaS Capital and DH Capital, What's your SaaS Company Worth?, at p.6.

c.   At some point, the acquiring company will run out of targets it can

feasibly buy (or face antitrust suits and regulatory proceedings).

i.   Defendants have said organic growth is a key metric of Tangoe and that
they regularly monitor it.

118.   Since before its IPO, Tangoe has listed four metrics as critical to evaluating its

success, of which one is recurring revenue growth.

119.   Thus, with respect to recurring technology revenue growth, Tangoe has

continually represented that "*[w]e regularly review our recurring revenue growth to measure

our success*."[19]

The difference between organic growth below 20% and organic growth above

20% is the difference between Tangoe succeeding and Tangoe failing.

120.   Tangoe's business plan has two basic goals concerning revenue growth: (a)

acquire companies to boost revenue growth, but always (b) maintain organic revenue growth

above 20%, every year, over the long term. Defendants have invited investors to judge Tangoe's

performance by whether or not it grew organically by 20%:

"*[T]he strategy we are executing against will support organic recurring revenue*

*growth of 20% or better from a longer-term perspective*. -Subbloie, 2Q 2011

Earnings call.

"*From a long-term perspective, we intend to selectively execute M&A to deliver*

*accelerated growth and increase our market share, which will augment our*

---

[19] E.g.S-1 registration statement, filed April 16, 2010, at 41, and every subsequent amended
version thereof; Prospectus, filed July 27, at 43; 10-K for the period ending December 31, 2011,
at 44. The statement also appears, verbatim, in every 10-Q filed during the class period. All
Defendants signed every registration statement and every prospectus; Defendants Martino and
Subbloie signed every 10-Q.

*targeted organic recurring revenue growth of 20% or better.*" -Subbloie, 3Q 2011

earnings call.

"*From a long-term perspective, our intent remains to selectively execute our*

*acquisition strategy to increase our market share and provide additional*

*opportunities to drive organic recurring revenue growth of 20% or better over the*

*long term*." -Subbloie, 4Q 2011 earnings call, and Q1 2012 earnings call.

"*From a long-term perspective, we continue to target organic recurring revenue*

*growth of 20% or better, complemented by strategic M&As.*" -Subbloie, Q2 2012

earnings call.

121.    Thus, if Tangoe cannot show organic growth above 20%, it is not meeting its

revenue growth target; if Tangoe disclosed that its organic growth is consistently below 20%,

investors would realize that Tangoe was failing at executing its business plan.

122.    Indeed, as Defendant Subbloie has pointed out, the market in which Tangoe

operates grows by 20% every year.[20] Hence, if Tangoe cannot grow organically by 20% year-

over-year, it is not even keeping market share.

123.    And, finally, as DH Capital and SaaS Capital noted, investors expect SaaS

business to grow organically by at least 20% per year if they are to give them the stratospheric

valuations they give Tangoe.

C.    *Additional facts probative of scienter or culpable participation*

Defendants Subbloie and Martino received weekly memoranda and participated in

weekly conference calls in which Tangoe's revenues were exhaustively discussed

124.    Between August 2009 and at least November 2012, which includes the entire

---

[20] *E.g.* Subbloie on Q2 2011 earnings conference call, on August 23, 2011.

Class Period, Tangoe provided senior management weekly memorandums focused on revenues. The weekly memorandums set out every single contract in which Tangoe expected to earn revenue, and for each contract provided the customer's name, the revenue amount, the sales representative, the sales representative's manager, the date of the contract, and if it was closed or still pending. The weekly memorandums were produced in an Excel spreadsheet and organized using Salesforce.com software.

125.    Guyotte received the memorandums. Subbloie and Martino received every weekly memorandum.

126.    Then, every Monday afternoon, Tangoe held a conference call to discuss the weekly reports. The calls were chaired by Chris Mazzatesta, a senior vice president of global sales, and Matt Kane, a vice president. The calls each lasted about an hour, and covered each contract listed in that week's memorandum.

127.    Guyotte took part in the calls. Subbloie and Martino frequently, if not always, took part in the calls; indeed, Guyotte recalls hearing frequent comments from Subbloie and Martino.

128.    According to Guyotte, the weekly reports and conference calls made it clear that Tangoe "gobbled up" the revenues of the companies it acquired.

Defendants all sell millions of dollars of shares.

129.    On August 1, 2011, Tangoe conducted its IPO, netting proceeds of about $67 million. Tangoe used the proceeds of its IPO to pay down its debt. In April 2012, Tangoe completed a follow-on offering, raising an additional $37.7 million.

130.    Tangoe's valuation in its IPO was about 4.5x its 2010 revenues, and Tangoe's valuation in the follow-on offering was about 7.1x its 2011 revenues.

131.    In the secondary offering, Tangoe's investor backers sold most, if not all, of their stock.

132.    Attached as Exhibit 1 and incorporated by reference is a chart showing stock sales of: all Defendants.

Defendants Subbloie and Martino have already committed fraud as CEO and CFO of a company backed by Defendant Golding's Edison Ventures.

133.    Subbloie and Martino were, respectively, CEO and CFO of IMA. Edison Ventures was IMA's primary backers.

134.    In 1999, IMA was faced with a cash shortfall that threatened to cause its bankruptcy. It had barely $2 million in cash -- and was burning through about $8 million per fiscal quarter -- at the end of June of that year. Yet it had had a bad quarter, having lost $6.8 million on revenues of about $9 million.

135.    To entice investors to provide the cash IMA needed for its operations, Subbloie and Martino caused IMA to record about $4 million in fictitious revenue, and to cut its operating loss to $1.8 million, in an earnings release issued in August 1999. Using these cooked books, Subbloie and Martino caused IMA to obtain $10 million in financing. Soon thereafter, two separate auditors resigned from auditing IMA's financial statements.

136.    A week after the press release announcing these manufactured results, Edison sold $1.2 million of IMA stock.

137.    On November 19, 1999, defendants revealed IMA's true financial condition, its stock price fell by $2.875.

138.    In March 2000, Subbloie and Martino resigned. By July, IMA was in bankruptcy. Edison Ventures was not listed as owning IMA stock.

46

139.    Investors sued IMA, Subbloie, and Martino, and no other defendants. The defendants settled the claims for $4.1 million, or according to the plaintiffs' calculations, about $0.75 per share.

140.    The median settlement in securities class actions between 1996-2011 returned 2-3% of damages to the class, and the median settlement even in very small cases returned about 10.5% of damages. The IMA settlement, which recovered about 26% of investors' losses, thus greatly surpassed the median settlement, though Subbloie and Martino had entered into it even before a decision on their motion to dismiss.

Edison Ventures and Defendant Goldin are closely involved in Tangoe's management.

141.    Edison Ventures was Tangoe's first major investor.

142.    Edison Ventures invested about $8 million in Tangoe prior to its IPO. Its first investment was $2 million in  2002.

143.    Edison Ventures sold its Tangoe shares for a 10x profit, issuing a press release to tout its success.

144.    Defendant Subbloie stated, concerning Edison and Defendant Golding:

Having met and worked with quite a few venture firms, I love the Edison philosophy. They focus very heavily on the business itself, it's not just about capital and money. Edison takes a general interest in the business itself, gets involved and is not overbearing about it, which in many ways is important when you're a CEO running a business. That board level attention is important at the right time and Edison has done a great job with that.
[...]
Garry Golding is on our board coming on nine years. It's been a great relationship and a good run for us. I'm a big believer that board alignment and experience are very important for the success of any business. Edison takes a pretty heavy focus on creating a good, solid board.

Tangoe may have engaged in earnings manipulation.

47

145.    According to Josh Guyotte, Tangoe would "sometimes" ask clients to sign contracts to continue service, but agree not to start billing the customer for two or three months.

146.    To memorialize their agreement, Tangoe and the customer would sign a letter of intent, which included language providing that the customer would not be billed until the date they had agreed to.

147.    Guyotte believes Tangoe then recognized the revenue up front.

148.    According to Guyotte, Tangoe did this a handful of times every quarter.

**VIII.   LOSS CAUSATION**

149.    On August 28, 2012, thestreetsweeper.org published an analyst report entitled "Dancing on an Old Grave, Digging a New Hole?"  The report concluded, among other things, that Tangoe's organic growth numbers appeared to have been generated by acquisitions, rather than organic growth. The report thus concluded that far from having benefited from organic growth, Tangoe was a "rollup" -- an exceptionally risky investing tactic in which investors buy many small companies in the same market and merge them.

150.    On this news, Tangoe shares declined $3.39 per share or nearly 17%, to close at $16.70 per share on August 28, 2012.

151.    On September 6, 2012, Copperfield published a research report concluding "that the company has significantly misrepresented its de novo [i.e., organic] growth rate, while demonstrating many of the telltale shenanigans and behavior that tends to be a harbinger for blow ups."  The report concluded the following about Tangoe:

> Based on our analysis Tangoe has been systematically underreporting the revenue contribution from acquisitions, which has had the effect of misrepresenting the company's organic growth. Our analysis suggests the CFO categorically falsified the impact from a recent acquisition on the Q2'12 earnings call, understating its impact by up to 60% compared to the figures disclosed in their quarterly 10Q.

48

This would mark the second time in the last three quarters that Tangoe has provided a lower revenue contribution from acquisitions on its calls than it ultimately discloses in SEC filings. This effectively overstates organic growth.

The REAL Organic Growth Rate

We are unable to reconcile CFO Martino's public statements about organic growth. Current SEC filings combined with management's guidance at face value, leads to an implied organic revenue growth rate that IS WELL BELOW 20%. Based on our analysis, we believe Tangoe's organic growth rate may be almost 50% lower year-to-date than the rate many analysts have communicated. If we assume ProfitLine's revenue is flat year-over-year (rather than the decline management implied with their guidance) and we annualize the revenue for ttMobiles from Q1'12, then organic growth has been closer to ZERO year-to-date.

[...]

We believe that with our report, sellside "estimates" will no longer matter and Tangoe's new benchmark to demonstrate 20% growth will be based on our analysis (which is rather straight forward). We clearly illustrate why Tangoe's actual results will need to be $2.28M and $3.69M higher than the midpoint of their guidance for Q3 and Q4 respectively if they are actually growing at least 20%. This assumes they do not underreport the Symphony acquisition.

152.    On this news, Tangoe shares declined $1.03 per share or 6% on September 6, 2012.  The stock continued to decline an additional $1.68 per share or 10.5% to close at $14.29 per share on September 7, 2012.

## IX. POST CLASS-PERIOD EVENTS CONFIRM THAT TANGOE HAD BEEN IMPROPERLY CLAIMING ITS REVENUE GROWTH WAS ORGANIC

*A.    Wedbush confirms Tangoe had been overstating revenue growth.*

153.    Soon after the Copperfield report was issued, analyst Scott Sutherland of Wedbush Securities concluded that it showed Tangoe's management had made statements which were, at best, misleading. Wedbush stated:

***True organic recurring growth may be debatable, but we believe the truth may lie somewhere between management guidance and recent analyses.***[21] Tangoe's

---

[21] Emphasis in original. Reference is to Copperfield and thestreetsweeper.org.

management has indicated organic recurring revenue growth in the low-to-mid 20s in 1H12. Copperfield research implies real organic growth of total revenue of 14% in 1H12. However, we believe the Copperfield analysis takes a more aggressive view of acquired revenue and assumes revenue from acquisitions was flat. Based on our checks, we believe Tangoe's acquisitions have mostly seen flat to declining revenue. However, given upside in Q2 was driven by License, Consulting, and Other revenue; we believe true organic recurring growth in the 15-20% range. Last, according to filings, if acquisitions were always part of Tangoe, then overall growth would have been 13%. Again, assuming generally flat revenue for acquisitions, this would also imply overall organic growth in the 15-20% range. However, given management only indicates organic recurring revenue and not total revenue, their calculation is more difficult to triangulate upon.

  *    *    *    *    *    *

**Beat-and-raise game is mostly driven by acquisitions.** While it is normal in the market for companies to be conservative with the contribution from acquisitions, given Tangoe's aggressive M&A strategy, the upside from multiple acquisitions layering on top of each other, the upside driven for Tangoe is more material. While we see this driving a beat and raise in 2H12, should it be shown that the Symphony Teleca TEM asset is helping drive the upside, we expect questions to linger.

**Acquisition-related cash flow hard to prove.** Copperfield indicates that Tangoe's cash flow may have been aided by the $5.4 million of net current assets acquired in the HCL-EMS, Telwares, ProfitLine, Anomalous, and ttMobiles acquisitions. However, Tangoe's net current assets from the start of 2011 have increased $1.7 million. While not denying that M&A may have aided cash flow, our analysis would imply $3.7 million, or 23% of free cash flow has come from M&A, not 38% as Copperfield implies.

**We do believe there is some credibility to the argument that Tangoe should be viewed more as a BPO rather than a SaaS model.** With recurring revenue gross margin of ~55%, annualized revenue per employee in Q2 of $131K, and a low capex/sales rate of ~1%, Tangoe does not exhibit the characteristics of a typical scalable technology-based SaaS business. Furthermore, out checks, which we highlighted in our initiation, indicate that technology integration appears to be Tangoe's Achilles' heel and that there is a lot of manual and custom processes in Tangoe's business that are more like a BPO business. This could imply lower multiples for Tangoe than currently given to traditional SaaS businesses.

  B.   *After Tangoe's fraud is exposed, Defendants lower estimates of Tangoe's organic*

      *growth rate.*

   154.  On November 6, 2012, Tangoe held an earnings call to discuss its Q3 2012

earnings. Defendants admit that Tangoe's business plan is to have organic growth rate of 20% or

more. Defendants admit that they closely monitor Tangoe's organic growth rate. Yet Defendants refused to provide an organic growth rate for Tangoe's third quarter of 2012. They did, however, predict organic growth of 16-18% for 2013.

155.    There, after analysts had called attention to Tangoe's organic growth manipulation, Defendants at last provided a definition of organic growth. Defendants, however, did not disclose the revenue attribution rules which ensured that virtually all revenue growth generated by acquired companies, and then those revenues themselves, would be counted as "organic growth."

156.    But in explaining Tangoe's definition of organic growth, Defendant Martino made an admission which suggests that Tangoe had been misattributing revenues:

> There are number of different ways in which companies and analysts can calculate organic growth. That said, if we take the most narrowly defined definition that includes acquisitions after an acquisition has been with the company for four full quarters, then our guidance would imply organic recurring revenue growth of 16% to 18% for the full year 2013. ***This growth will be slightly higher using a longer-term timeframe that takes into consideration the fact that it takes time to migrate customers post our consolidation acquisitions***.[22]

157.    Counting revenues made by the companies Tangoe acquired earlier should lead to *higher* organic growth; the earlier Tangoe can label revenue growth "organic", the higher its organic growth rate. But the paradox dissolves because Tangoe already counts virtually all growth generated by its acquired companies as organic growth. Since the acquired companies' revenue *growth* already counts towards organic growth, including them earlier just increases the denominator (revenue) without increasing the numerator (revenue increase) in the equation that determines organic growth rate. Therefore, because Tangoe was already attributing the acquired companies' revenue growth and even their revenues to its Core Subsidiary, including the

---

[22] Source: Defendant Martino, Q3 2012 earnings conference call, 2012-11-06.

subsidiary's revenues in the earlier period just means that the same amount of "organic" revenue growth is attributed to a company with higher revenues, decreasing the organic revenue growth rate.

158.     Then, on February 13, 2013, Tangoe held its conference call to discuss its Q4 2012 earnings. Then as well, Defendants refused to provide an estimate of organic growth, though they reiterated an estimate of 16-18%.

159.     On May 9, 2013, Tangoe held its Q1 2013 earnings call. Defendants again refused to provide Tangoe's organic growth rate, dodging analysts' questions:

> **<Q - Chris Koh>**: - Stifel, Nicolaus & Co., Inc., Research Division
> This is Chris Koh for Tom. So just to clarify a little bit on the organic growth rate. I don't know, sorry if I missed it earlier, but if we try to back into an organic growth rate on recurring, I get something in the 12% to 13% range. I think you'd previously guided to 16% to 18% for the year. Are you still comfortable with that range? And if so, what gives a comfort that you're going to be able to accelerate in the back half?
> **<A - Albert Subbloie>**
> Well, thanks for the question Chris. Good to hear from you. Just a reminder, we had a good quarter in Q1. We're excited about it. We did give guidance annually at the end of the third quarter last year. We, obviously, upped that a little bit in Q4. We're not updating our view quarterly of organic growth and, obviously, feel really good about our sales performance. I think we feel good about the ramping in the second half of the year and the revenue growth. As we stated, we still feel good about all that. We had good performance, and our new logos are, obviously, a good testament of that, along with we're on course with our hiring plans on our pipeline. So we're feeling good about the year, as we stated, that we can achieve the -- reiterating the guidance that we get.

160.     On August 7, 2013, Tangoe held its Q2 2013 Earnings Call. Tangoe again refused to provide an organic growth rate.

## X.  PLAINTIFF'S CLASS ACTION ALLEGATIONS

161.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who: (1) purchased or otherwise acquired the common stock of Tangoe pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's IPO; or (2) purchased or otherwise acquired Tangoe common stock from July 26, 2011 to September 5, 2012, both dates inclusive (the "Class"); and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

162.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Tangoe common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tangoe or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

164.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

165.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tangoe;

- whether the Individual Defendants caused Tangoe to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Tangoe securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- the extent to which the members of the Class have sustained damages and the proper measure of damages.

166.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

167.    Plaintiff is entitled to a presumption of reliance because at all relevant times, the market for Tangoe's  common stock was an efficient market for the following reasons, among others:

(a)      During the Class Period, Tangoe's stock met the requirements for listing the NASDAQ, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      According to Tangoe's 2011 10-K, as of March 22, 2012, there were 34,296,976 shares of the Company's common stock issued and outstanding.

(c)      During the class period, on average, 2,283,610 shares of Tangoe common stock were traded on a weekly basis. Approximately 6.6% of all outstanding shares were bought and sold on a weekly basis, providing a very strong presumption of an efficient market;

(d)      As a regulated issuer, Tangoe filed periodic public reports with the SEC;

(e)      Tangoe regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)      Tangoe was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period, including Deutsche Bank, Stifel Nicolaus, Raymond James, Wunderlich Securities, Copperfield Research, thestreetsweeper.org, Oppenheimer, Barclays, Lazard, Management CV, Hunter Securities and RedChip. Each of these reports was publicly available and entered the public marketplace;

(g)      More than 10 NASD member firms were active market-makers in Tangoe's stock at all times during the Class Period; and

(h)      Unexpected material news about Tangoe was rapidly reflected and incorporated into the Company's stock price during the Class Period.

168.      As a result of the foregoing, the market for Tangoe's common stock promptly digested current information regarding Tangoe from all publicly available sources and promptly

reflected such information in Tangoe's stock price, permitting a presumption of reliance on the integrity of the market for Tangoe stock.

### XI. <u>COUNT I:(Against Tangoe, Subbloie and Martino For Violations of  Section 10(b)  And Rule 10b-5 Promulgated Thereunder)</u>

169.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

170.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

171.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tangoe securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Tangoe securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

172.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tangoe common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tangoe's finances and business prospects.

173.    As the senior managers and/or directors of Tangoe, Subbloie and Martino had knowledge of the details of Tangoe's internal affairs.  By virtue of their positions at Tangoe, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

174.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Tangoe common stock from their personal portfolios.

175.    Additional Information showing that the Defendants named in this Count acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

176.    Defendants Subbloie and Martino are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Defendants

Subbloie and Martino were able to and did, directly or indirectly, control the content of the statements of Tangoe.  As officers and/or directors of a publicly-held company, Defendants Subbloie and Martino had a duty to disseminate timely, accurate, and truthful information with respect to Tangoe's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tangoe common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Tangoe's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tangoe common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

177.    During the Class Period, Tangoe common stock was on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Tangoe common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Tangoe common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Tangoe common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

58

178.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

179.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

180.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of Tangoe common stock giving rise to the cause of action.

XII.    **COUNT II (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

181.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182.    During the Class Period, the Individual Defendants participated in the operation and management of Tangoe, and conducted and participated, directly and indirectly, in the conduct of Tangoe's business affairs.  Because of their senior positions, they knew the adverse non-public information about Tangoe's misstatement of income and expenses and false financial statements.

183.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tangoe's financial condition and results of operations, and to correct promptly any public statements issued by Tangoe which had become materially false or misleading.

184.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tangoe disseminated in the marketplace during the Class Period concerning Tangoe's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Tangoe to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Tangoe within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tangoe common stock.

185.     Each of the Individual Defendants, therefore, acted as a controlling person of Tangoe.  By reason of their senior management positions and/or being directors of Tangoe, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Tangoe to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Tangoe and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

186.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tangoe.

187.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of Tangoe common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative and designating Plaintiff's counsel as Class counsel;

B.      Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues that may be so tried.

Dated:  October 18, 2013

Respectfully submitted,

__/s/ Henry Elstein_____

**GOLDMAN GRUDER & WOODS, LLC**
Henry Elstein
Bruce L. Elstein
105 Technology Dr., Suite 2A
Trumbull CT 06611
Telephone: 203-880-5333
Facsimile: 203-880-3332

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (*admitted pro hac vice*)
Jonathan Horne (admitted pro hac vice)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com

**-and-**

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue -  20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
migross@pomlaw.com

# EXHIBIT 1

## EXHIBIT 1 -- STOCK SALES

Albert R. Subbloie Jr. (**CEO, Chair of the Board, and President**)

| Action | Date | Proceeds/Cost |
|---|---|---|
| Sell | 8/1/2011 | $1,383,756.3 |
| | 8/2/2011 | $553,498.8 |
| | 4/3/2012 | $3,496,500 |
| Buy | 8/1/2011 | 0 |
| | 8/1/2011 | $(132,902.73) |
| | 8/1/2011 | $(50,110.12) |
| | 8/2/2011 | $(73,204.68) |
| | 2/13/2012 | 0 |
| | 4/3/2012 | $(7,7018.91) |
| | 4/3/2012 | $(168,981.09) |
| Holdings at beginning | | 0 |
| Summary | Total proceeds | $5,433,755 |
| | Total expenditures | $502,217.61 |
| | Total Net Proceeds | **$4,931,537.39** |

Gary Martino, **CFO**

| Action | Date | Proceeds/Cost |
|---|---|---|
| Sell | 8/1/2011 | $424,052.1 |
| | 8/2/2011 | $169,613.4 |
| | 4/3/2012 | $1,171,327.5 |
| Buy | 8/1/2011 | 0 |
| IPO | | 0 |
| Summary | Total proceeds | $1,764,993 |
| | Total expenditures | $0 |
| | Total Net Proceeds | **$1,764,993** |

Gary Patrick Golding, *Director*,

*The Edison entities*

| Action | Date | Proceeds/Cost |
|---|---|---|
| Sell | 8/1/2011 | $2,130,806.7 |
| | 8/2/2011 | $422,266.5 |
| | 8/2/2011 | $2,460,082.5 |
| | 4/3/2012 | $13,356,769.86 |
| | 4/3/2012 | $38,912,793.26 |
| | 8/20/2012 | 0 |
| | 8/20/2012 | $739,307.3 |
| | 8/20/2012 | $62,078.1 |
| | 8/21/2012 | $760,875 |
| | 8/22/2012 | $1,205,486.08 |
| | 8/27/2012 | $37,966 |
| | 5/22/2013 | $20,661,000 |
| Buy | 8/1/2011 | 0 |
| | 8/1/2011 | 0 |
| | 8/1/2011 | 0 |
| | 8/1/2011 | 0 |
| | 8/1/2011 | 0 |
| | 8/1/2011 | 0 |
| | 8/15/2012 | ($87,107.6) |
| | 8/15/2012 | ($110,545.45) |
| | 8/20/2012 | 0 |
| Summary | Total proceeds | $80,749,431.3 |
| | Total expenditures | $1,976,530 |
| | Total Net Proceeds | **$80,551,778.25** |