UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LEWIS STEIN, Individually and on Behalf         :
of All Other Similarly Situated,                :
      Plaintiff,                              :         CIVIL ACTION NO.
                                              :         3:13-cv-00286 (VLB)
v.                                              :
                                              :
TANGOE, INC., ALBERT R. SUBBLOIE JR.,           :
GARY R. MARTINO, and                            :
GARY P. GOLDING                                 :         September 30, 2014
      Defendant.                              :

MEMORANDUM OF DECISION GRANTING
DEFENDANTS' MOTION TO DISMISS [Dkt. 72]

**I.     Introduction**

Lead Plaintiff Lewis Stein brings this action individually and on behalf of all others similarly situated against Tangoe Inc., a publicly traded, Delaware corporation with principal executive offices located in Orange, Connecticut ("Tangoe"), Albert R. Subbloie Jr., Tangoe's Chairman of the Board of Directors ("Board") and President and Chief Executive Officer ("CEO"), Gary R. Martino, Tangoe's Chief Financial Officer ("CFO"), and Gary P. Golding, a director on Tangoe's Board, alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "Act") and Rule 10(b)-5 and 17 C.F.R. § 240.10b-5, promulgated thereunder, occurring between July 27, 2011 and September 4, 2012 (the "Class Period").  The Plaintiff styles this as a fraud on the market action brought on behalf of all those who purchased Tangoe's common stock during the Class Period.  The Defendants have moved to dismiss the Consolidated Class Action Complaint (the "Complaint") pursuant to Fed. R. Civ.

P. 12(b)(6) for failure to state a claim upon which relief may be granted and for failure to plead fraud with specificity as required under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  For the reasons that follow, the Defendant's Motion to Dismiss is GRANTED.

## II.     Background

The following allegations are taken from the Complaint [Dkt. 66] and from public documents, including Tangoe's filings with the Securities and Exchange Commission ("SEC"), and documents that the Plaintiff references and incorporates in the Complaint or relied upon in drafting his Complaint.  Tangoe develops and markets products that help companies manage and control their fixed and mobile communications assets and costs.  [Dkt. 66, ¶ 2].  Tangoe's products help companies track sourcing, asset procurement, services provisioning, invoice processing, expense allocation, bill payment, policy enforcement, usage management, and product inventory.  [*Id.*].

The Plaintiff alleges that Tangoe claims to be a Software-as-a-Service ("SaaS") business, which is a business that develops software and offers it to clients via off-site servers located in the "cloud."  [*Id.* at ¶ 7].  Once the software has been designed, there is very little incremental cost to a SaaS company associated with selling the product to an exponentially increasing number of potential customers.  [*Id.*].  "Stated differently, SaaS businesses scale virtually without cost, as most of their costs are incurred up-front when they develop the software.  Thus, for SaaS businesses, a large fraction of every new dollar in

2

organic revenue growth is pure profit." [*Id.*].  Furthermore, the Plaintiff alleges that an organic growth metric, which is an analytic measurement of a company's revenue, is incredibly important to investors in SaaS companies.  [*Id.*].  The Plaintiff alleges that "[b]usiness analysts typically measure organic growth by taking all revenue growth and subtracting acquired companies' contribution to revenues."  [*Id.* at ¶ 9].  For SaaS companies, investors usually expect at least 20% annual organic growth for a company to be considered profitable and, therefore, a sound investment.  [*Id.* at ¶ 8].  The Plaintiff alleges that Tangoe openly acknowledged the importance of this benchmark by continually representing that "[w]e regularly review our recurring revenue growth to measure our success."  [*Id.* at ¶ 119].[1]

        According to the Plaintiff, Tangoe's business strategy included two methods of generating revenue: (a) a strategic mergers and acquisitions plan, called a roll-up strategy, and (b) augmenting organic revenue above 20% annually.  [*Id.* at ¶ 120].[2]  Between January 2011 and July 2012, Tangoe acquired

---

[1] The Plaintiff appears to use "organic growth" and "recurring revenue growth" interchangeably without explanation.  Ostensibly, this use stems from Tangoe's public statements, which also appear to use these terms interchangeably.

[2] *See* Subbloie, 2Q 2011 Earnings Call ("[T]he strategy we are executing will support organic recurring revenue growth of 20% or better from a longer-term perspective."); Subbloie, 3Q 2011 Earnings Call ("From a long-term perspective, we intend to selectively execute M&A to deliver accelerated growth and increase our market share, which will augment our targeted organic recurring revenue growth of 20% or better."); Subbloie, 4Q 2011 Earnings Call ("From a long-term perspective, our intent remains to selectively execute our acquisition strategy to increase our market share and provide additional opportunities to drive organic

five companies: HCL Expense management Inc. ("HCL"), Telwares, Inc. ("Telwares"), ProfitLine, Inc. ("ProfitLine"), Anomalous Networks, Inc. ("Anomalous"), and ttMobiles, Inc. ("ttMobiles").  [*Id.* at ¶ 10].  As a result of these acquisitions, Tangoe's revenue increased in excess of $48 million compared to Tangoe's total revenues of $68 million in 2010.  [Dkt. 77, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, p. 8].  This strategy also made it difficult for outside investors to discern the amount of growth that was organic as opposed to growth attributable to these acquisitions.  [Dkt. 66, ¶ 10]. Given this difficulty, Tangoe issued estimates of its organic growth during the Class Period in various forms, including public statements and on analyst phone calls.  [*Id.*].

The Plaintiff alleges that Tangoe claimed its "organic recurring revenue growth rate for the second quarter and first half of 2011 were 28% each," that its "organic recurring revenue growth rate for the third quarter of 2011 was greater than it was in Q2 for 2011, and thus greater than 28%," that its "organic recurring revenue growth rate for the fourth quarter of 2011 was in the 'mid-20%' range," that its "organic recurring revenue growth for the first quarter of 2012 was 'in the low to mid-20% range," and that its "organic recurring growth rate for the second quarter of 2012 was 'in the low-to-mid 20% range."  [Dkt. 66, ¶ 35].

---

recurring revenue growth of 20% or better over the long term."); Subbloie, Q2 2012 Earnings Call ("From a long-term perspective, we continue to target organic recurring revenue growth of 20% or better, complemented by strategic M&As.").

As related to its business strategy, Tangoe released several public statements boasting its efforts at cross-selling its products with the newly acquired companies and integrating the companies to produce effective synergies.  For example, on the third quarter 2011 earnings call, Subbloie stated that "[w]e are also excited about the opportunity to cross-sell and up-sell our broader suite of solutions on our expanded customer base and have successfully implemented this strategy with customers such as Fifth Third, AmerisourceBergen, AIG and General Electric among others."  In December 2011, after the ProfitLine acquisition, Subbloie stated that "[w]e have had a successful track record of driving strong organic growth as well as integrating acquisitions and cross-selling our suite of solutions and believe our acquisition of ProfitLine further expands Tangoe's market leadership position."  On the same conference call, Marino stated, "[s]o in summary, we are very excited about the acquisition. Tangoe has a successful track record of integrating acquisitions; migrating customers on to our platform and cross-selling our suite of solutions, which we expect to translate to additional organic growth opportunities longer term."

On August 28, 2012, a short-seller analyst, TheStreetSweeper.org ("SweetSweeper"), published a report entitled "Dancing on an Old Grave, Digging a New Hole?" which concluded, among other things, that Tangoe's growth strategy had been largely driven by risky acquisitions, and its organic growth numbers appeared to have been generated by its acquisitions, not organically. [Dkt. 66, ¶ 149].  After this report was released, Tangoe's shares declined $3.39 per share or nearly 17%, to close at $16.70 per share.  [*Id.* at ¶ 149].  On

5

September 6, 2012, another short-seller analyst, Copperfield, published a report

stating, "that the company has significantly misrepresented its de novo growth

rate, while demonstrating many of the telltale shenanigans and behavior that

tends to be a harbinger for blow ups."  [*Id.* at ¶ 151].  It postulated that

> [b]ased on our analysis Tangoe has been systematically
> underreporting the revenue contribution from
> acquisitions, which has had the effect of
> misrepresenting the company's organic growth.  Our
> analysis suggests the CFO categorically falsified the
> impact from a recent acquisition on the Q2'12 earnings
> call, understating its impact by up to 60% compared to
> the figures disclosed in their quarterly 10Q.  This would
> mark the second time in the last three quarters that
> Tangoe has provided a lower revenue contribution from
> acquisitions on its calls than it ultimately discloses in
> SEC filings.  This effectively overstates organic growth.
>
> . . .
>
> We are unable to reconcile CFO Martino's public
> statements about organic growth.  Current SEC filings
> combined with management's guidance at face value,
> leads to an implied organic revenue growth rate that IS
> WELL BELOW 20%. Based on our analysis, we believe
> Tangoe's organic growth rate may be almost 50% lower
> year-to-date than the rate many analysts have
> communicated.  <u>If we assume ProfitLine's revenue is flat
> year-over-year (Rather than the decline management
> implied with their guidance) and we annualize the
> revenue for ttMobiles from Q1'12, then organic growth
> has been closer to ZERO year-to-date.</u>
>
> . . .
>
> We believe that with our report, sellside "estimates" will
> no longer matter and Tangoe's new benchmark to
> demonstrate 20% growth will be based on our analysis
> (which is rather straight forward).  We clearly illustrate
> why Tangoe's actual results will need to be $2.28M and
> $3.69M higher than the midpoint of their guidance for Q3
> and Q4 respectively if they are actually growing at least

> 20%.  This assumes they do not underreport the
> Symphony acquisition.

[*Id.* at ¶ 149; Dkt. 73-12, Copperfield Research Report, Tangoe (TNGO) – The

Misrepresented Dance, pp. 2-3].  Allegedly on this news, Tangoe's share value

declined by $1.03 per share or 6% on September 6, 2012, and continued to decline

the following day by an additional $1.68 per share or 10.5% to close at $14.29 per

share.  [*Id.* at ¶ 152].  Importantly, both the SweetSweeper and Copperfield analyst

reports contained a disclaimer that they had a financial interest in Tangoe and

stood to benefit from a decline in stock price.  [*See* Dkt. 73-11, p. 8; Dkt. 73-12, p.

1].

Soon after the Copperfield report was released, analyst Scott Sutherland of

Wedbush Securities ("Wedbush"), issued another report stating that "[w]hile

recent reports from TheStreetSweeper and Copperfield Research suggest

Tangoe's management may have misrepresented organic growth and OCF

estimates masked by an aggressive roll-up strategy, after our initial analysis and

rounds of checks, we believe the truth lies somewhere in between.  In addition,

the reports brought up other concerns including competition and the true nature

of Tangoe's SaaS model."  [Dkt. 73-13, Wedbush Quick Note, Tangoe (TNGO-

OUTPERFORM): Proceeding with Caution as Allegations Are a Concern, but

Likely Overblown, p. 1].  The report continued

- True organic recurring growth may be debatable,
  but we believe the truth may lie somewhere
  between management guidance and recent
  analyses.  Tangoe's management has indicated
  organic recurring revenue growth in the low-to-

7

mid 20s in 1H12.  Copperfield research implies real organic growth of total revenue of 14% in 1H12.  However, we believe the Copperfield analysis takes a more aggressive view of acquired revenue and assumes revenue from acquisitions was flat.  Based on our checks, we believe Tangoe's acquisitions have mostly seen flat to declining revenue.  However, given upside in Q2 was driven by License, Consulting, and Other revenue; we believe true organic recurring growth in the 15-20% range.  Last, according to filings, if acquisitions were always part of Tangoe, then overall growth would have been 13%.  Again, assuming generally flat revenue for acquisitions, this would also imply overall organic growth in the 15-20% range.  However, given management only indicates organic recurring revenue and not total revenue, their calculation is more difficult to triangulate upon.

- Copperfield analysis implying 5.6% organic growth in 2H12, according to guidance, appears to be overly conservative.  We would point out that the analysis assumes flat revenue growth from acquisitions rather than slightly declining revenue per our checks and management's guidance and does not assume the typical upside the company delivers each quarter, which we expect to occur in both Q3 and Q4.  That said, should Tangoe deliver the typical $1 million of upside per quarter, we see organic growth in the 10-15% range.

- Beat-and-raise game is mostly driven by acquisitions.  While it is normal in the market for companies to be conservative with the contribution from acquisitions, given Tangoe's aggressive M&A strategy, the upside from multiple acquisitions layering on top of each other, the upside driven for Tangoe is more material.  While we see this driving a beat and raise in 2H12, should it be shown that the Symphony Teleca TEM asset is helping drive the upside, we expect questions to linger.

8

- **Acquisition-related cash flow hard to prove.** Copperfield indicates that Tangoe's cash flow may have been aided by the $5.4 million of net current assets acquired in the HCL-EMS, Telwares, ProfitLine, Anomalous, and ttMobiles acquisitions.  However, Tangoe's net current assets from the start of 2011 have increased $1.7 million.  While not denying that M&A may have aided cash flow, our analysis would imply $3.7 million, or 23% of free cash flow has come from M&A, not 38% as Copperfield implies.

- **We do not believe there is some credibility to the argument that Tangoe should be viewed more as a BPO rather than a SaaS model.  With recurring revenue gross margin of ~55%, annualized revenue per employee in Q2 of $131K, and a low capex/sales rate of ~1%, Tangoe does not exhibit the characteristics of a typical scalable technology-based SaaS business.  Furthermore, our checks, which we highlighted in our initiation, indicate that technology integration appears to be Tangoe's Achilles' heel and that there is a lot of manual and custom processes in Tangoe's business that are more like a BPO business.  This could imply lower multiples for Tangoe than currently given to traditional SaaS businesses.**

[*Id.*].  As this report was technically published outside of the Class Period, the Plaintiff has not alleged what effect, if any, this report had on Tangoe's stock price.  While this report does not contain a disclaimer stating that it has a financial interest in Tangoe, it does state that "Wedbush Securities does and seeks to do business with companies covered in its research reports.  Thus, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report."  [*Id.* at p. 1].

Subsequent to these analyst reports, the Plaintiff alleges that Tangoe executives altered the tone of the earnings announcements.  On November 6,

9

2012, Tangoe held an earnings call to discuss its Q3 2012 earnings, but in contrast to what it had provided previously, it refused to disclose its actual organic growth rate. [Dkt. 66, ¶ 154]. Instead, it predicted organic growth of 16-18% for 2013. [*Id.*]. When pressed by an analyst to provide a definition for its organic growth calculation, Martino responded that

> [t]here are a number of different ways in which companies and analysts can calculate organic growth. That said, if we take the most narrowly defined definition that includes acquisitions after an acquisition has been with the company for four full quarters, then our guidance would imply organic recurring revenue growth of 16 to 18% for the full year 2013. This growth will be slightly higher using a longer-term timeframe that takes into consideration the fact that it takes time to migrate customers post our consolidation acquisitions.

[*Id.* at ¶ 156]. For the subsequent earnings calls in 2013, Tangoe did not provide a specific organic growth metric nor did it release any corrective disclosures with respect to its previously released figures. [*Id.* at ¶¶ 157-60].

The Plaintiff alleges that Tangoe artificially inflated its organic growth figure, thereby understating the acquired companies' contributions to revenue, in four ways: first, it attributed revenues from the acquired companies' pipeline contracts to its core subsidiary; second, it attributed revenues from selling its products to the acquired companies' customers to its core subsidiary; third, it attributed revenues to its core subsidiary from selling the acquired companies' products to existing customers of its core subsidiary; and fourth, once it migrated the acquired companies' customers to its platform, it attributed all further revenues to its core subsidiary. [*id.* at ¶¶ 12-15]. As support for this

10

contention, the Plaintiff offers the views of several Tangoe employees as well as a deferred revenues analysis based entirely on Tangoe's SEC filings and other public information.

The first witness cited by the Plaintiff is Becky Thompkins, an Account manager for Telwares between 2010 and Tangoe's acquisition of the company in March 2011, who continued managing customer accounts until June 2012.  She stated that the migration of Telwares customers to Tangoe started soon after a June 2011 meeting in which Subbloie said Tangoe would "eat up the competition."  [*Id.* at ¶ 38].  Second, Hugh Roger was the Director of Operations at Telwares from February 2008 until the acquisition in March 2011 and employed as a consultant performing the same functions until January 2012; he was in charge of running Telwares' invoice processing system and its revenue tracking system and supervised approximately 60 employees.  [*Id.* at ¶ 39].  Roger stated that after Tangoe acquired a company, its salespersons would begin calling the acquired company's customers, seeking to sell them Tangoe's products.  [*Id.* at ¶ 57].  He also reported that Telwares prepared its financial statements for Tangoe's use after the acquisition, but that Telwares was not provided with revenue numbers from the acquired companies; thus, it did not include in its financial statements a list of revenues from migrated customers.  [*Id.* at ¶ 63].  Third, Gina Oster, Vice President of Finance and Corporate Controller at ProfitLine from November 2007 until December 2011, was hired as a consultant for Tangoe until May 2012 where she reported to Tom Beach, Vice President of Finance at Tangoe, and was responsible for keeping ProfitLine's financial accounts and generating its

financial statements.  [*Id.* at ¶ 40].  According to Oster, ProfitLine's outlook for 2012 was for "stable" revenues.  [*Id.* at ¶ 83].  Fourth, Josh Guyotte was the Director of Mobile Sales at Tangoe, Inc., where he led a sales force in the Management Division from August 2009 until he resigned in November 2012.  [*Id.* at ¶ 42].  Guyotte received a weekly memorandum detailing all the pending and recently closed contracts at Tangoe, which listed for every contract the sales person responsible, the sales person's manager, and the total revenue expected from the contract.  [*Id.* at ¶ 43].  After reviewing the memorandum, he would attend weekly conference calls to discuss the memorandums, and Subbloie and Martino frequently attended and commented during the calls.[3]  [*Id.*].  According to Guyotte, the weekly memorandums made clear that Tangoe was "gobbling up" the acquired companies' revenues and improperly attributing them to Tangoe's core subsidiary.  [*Id.*].  He stated that he was always skeptical concerning Subbloie's and Martino's claim that Tangoe's organic growth rate was above 20%, claiming that he always "chuckled" when he heard them tell investors that Tangoe was growing by 20%.  [*Id.* at ¶ 45].  According to Guyotte, the contracts with the new customers of the acquired companies would close within a quarter

---

[3] Specifically, Guyotte alleges that these meetings occurred between August 2009 and at least November 2012.  The weekly memorandums listed every single contract in which Tangoe expected to earn revenue, and for each contract, provided the customer's name, the revenue amount, the sales representative, the sales representative's manager, the date of the contract, and if the contract was closed or still pending.  The weekly conference calls were chaired by Chris Mazzatesta, a senior vice president of global sales, and Matt Kane, a vice president.  [Dkt. 66 at ¶ 126].

of the acquisition, and Tangoe would attribute the revenues generated by those contracts to its core subsidiary.  [*Id.* at ¶ 56].  He further recalled that as soon as the acquisitions were complete, his division always tried to cross-sell Tangoe's mobile device security to the acquired companies' customers, often times by bundling the new offerings with the products the customer had already purchased from the acquired company.  [*Id.* at ¶ 57].  As related to migration, he reported that once a client was migrated to Tangoe's platform, the revenues were attributed to the core subsidiary.  [*Id.* at ¶ 62].  According to Guyotte, HCL had $1-1.5 million in revenues in its pipeline when it was acquired.  Immediately following the acquisition, Tangoe attributed all of this revenue to Tangoe's core subsidiary in order to artificially generate organic growth.  Guyotte adds that when Tangoe acquired companies that had signed contracts with clients for whom service of the contract had not begun, Tangoe always attributed revenues from those clients to its own core subsidiary, even though the acquired company ultimately serviced the contracts.  [*Id.* at ¶ 69].  He claims to have been personally involved in these efforts, as he, his staff, and others at Tangoe were instructed to call an acquired company's customers to sell them Tangoe's other products.  He understood that the revenue earned from such sales would be recognized as Tangoe's "organic" revenue.  [*Id.* at ¶ 70].  Guyotte also reported that when Tangoe acquired ProfitLine, ProfitLine had about $2-3 million in revenues from clients who had signed contracts that ProfitLine had not begun performing, and Tangoe attributed these revenues to its core subsidiary.  [*Id.* at ¶ 84].  Finally, Chad Bennett, the Director of Account Management at Tangoe between February

13

2011 and 2012, previously employed by HCL, was responsible for selling Tangoe's products to HCL clients and stated that with respect to Tangoe, "[t]here was no organic growth.  It was all game bought . . . Where did that organic growth come from? All the acquisitions."  [*Id.* at ¶¶ 46-48].

In addition to these witnesses, the Plaintiff also supports its claim that Tangoe's organic growth metric was misrepresented with an analysis of Tangoe's deferred revenues during the Class Period.  [*Id.* at ¶¶ 86-106].  Deferred revenue is an item on a balance sheet for revenues that have been invoiced but have not yet been earned.  [*Id.* at ¶ 87].  Under Generally Accepted Accounting Principles ("GAAP"), revenue must be earned before it can be recognized.  [*Id.*].  Deferred revenues, therefore, are revenues that have been invoiced but that a company cannot yet recognize because it has not yet earned them by, in this case, performing the services purchased.  [*Id.*].  It is alleged that while Tangoe historically generated significant deferred revenues, as it tended to invoice customers 1-12 months before services were actually delivered, the acquired companies generally did not.  [*Id.* at ¶¶ 88-89].  Accordingly, in the fourth quarter of 2010, Tangoe's deferred revenues totaled approximately $10.1 million, representing roughly 14.8% of total revenues.  During the Class Period, after the acquisition strategy was commenced, deferred revenues declined to roughly 9% of total trailing twelve-month revenues even though Tangoe represented that its organic growth was more than 20%.  [*Id.*].  The Plaintiff argues that this decline in percentage proved that Tangoe included in its organic revenue calculation revenue attributable to the acquisitions because deferred revenues should have

14

otherwise increased.  [*Id.*].  The Defendants, however, contest this analysis because, they argue, it was based on a series of assumptions that are incorrect or lack a well-pleaded factual basis.  [Dkt. 72-1, Defendant's Memorandum in Support of its Motion to Dismiss, pp. 16-22].  Specifically, the Defendants argue that the deferred revenue amount did not increase as the Plaintiff expected because Tangoe's licensing business model, the part of its business that historically generated deferred revenues, was stagnant and because Tangoe predominantly billed its customers monthly starting in 2011, so no new sales contributed to deferred revenue.  [Dkt. 73-3, Transcript from August 23, 2011 Tangoe Q2 2011 Earnings Conference Call, at 6-7, cited in Complaint ¶ 35].

Finally, the Plaintiff also alleges that all named Defendants and Tangoe acted in a manner showing scienter with respect to the fraudulent or misleading statements because they profited from an inflated stock value.  [*Id.* at ¶¶ 129-48].  On August 1, 2011, Tangoe conducted an IPO, netting proceeds of about $67 million, which Tangoe used to pay down its debt.  [*Id.* at ¶ 129].  In April 2012, Tangoe completed a follow-on offering, raising an additional $37.7 million.  [*Id.*].  Tangoe's valuation in its IPO was about 4.5 times its 2010 revenues, and Tangoe's valuation in the follow-on offering was about 7.1 times its 2011 revenues.  [*Id.* at ¶ 130].  Defendant Subbloie sold $5.4 million of his shares at this time; Defendant Martino sold $1.8 million of his shares; and Golding, a general partner of Edison Venture Fund ("Edison")—Tangoe's principal financial backer—caused Edison to sell some of its shares during the Class Period for about $80 million.  [*Id.* at ¶ 18].  Furthermore, the Plaintiff alleges that Defendants Subbloie

15

and Martino participated in a similar scheme in 1999 while serving as CEO and CFO, respectively, of Information Management Associates ("IMA"), which was backed by Edison.  [*Id.* at ¶ 19].  In 1999, IMA was faced with a cash shortfall that threatened the need for bankruptcy protection: it had barely $2 million in cash and was spending about $8 million per fiscal quarter.  [*Id.* at ¶ 134].  To entice investors to provide the cash IMA needed for its operations, Subbloie and Martino caused IMA to record approximately $4 million in fictitious revenue, cutting its operating loss to $1.8 million, and released these figures in an earnings report in August 1999.  [*Id.* at ¶ 135].  Following the release of these figures, IMA obtained $10 million in financing.  Shortly after the report was released, two separate auditors responsible for reviewing IMA's financial statements resigned.  [*Id.*].  A week after a press release disclosed the accounting fraud, Edison sold $1.2 million of IMA stock, and on November 19, 1999, the Defendants revealed IMA's true financial condition, resulting in a stock price decrease of $2.875.  [*Id.* at ¶¶ 136-37].  In March 2000, Subbloie and Martino resigned, and by July 2000, IMA filed for bankruptcy protection.  [*Id.* at ¶¶ 137-38].  Subbloie and Martino were later sued for securities violations and settled those claims for $4.1 million—well above the median settlement range for securities litigation at that time.  [*Id.* at ¶ 139].  At the commencement of the bankruptcy, Edison was not listed as owning any IMA stock.  [*Id.* at ¶ 138].

### III.     Legal Standard

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. United States*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations and internal quotation marks omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility

standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

Additionally, a complaint alleging violations of § 10(b) and Rule 10b-5 must meet the heightened pleading standard of Fed. R. Civ. P. 9(b) and the rules prescribed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).  Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "To satisfy this requirement the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (citations and internal quotation marks omitted).  In particular, the plaintiff must allege facts that "give rise to a strong inference of fraudulent intent."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

Furthermore, under the PSLRA, the complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . shall state with particularity all facts on which that belief is informed;" and (2) plead facts "giving rise to a strong

18

inference that the defendant acted with the required state of mind."  15 U.S.C. §
78u-4(b)(1)(B), (b)(2)(A);  *see also Tellabs*, 551 U.S. at 321.

In general, the Court's review on a motion to dismiss pursuant to Rule
12(b)(6) "is limited to the facts as asserted within the four corners of the
complaint, the documents attached to the complaint as exhibits, and any
documents incorporated by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482
F.3d 184, 191 (2d Cir. 2007).  The Court may also consider "matters of which
judicial notice may be taken" and "documents either in plaintiffs' possession or
of which plaintiffs had knowledge and relied on in bringing suit."  *Brass v. Am.
Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica
HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

IV.     Discussion

A.  Section 10(b) of the Exchange Act

Section 10(b) of the Act makes it unlawful to "use or employ, in connection
with the purchase or sale of any security . . . any manipulative or deceptive device
or contrivance in contravention of such rules and regulations as the Commission
may prescribe as necessary or appropriate in the public interest or for the
protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the SEC
to implement this portion of the Act, makes it unlawful for any persons, directly or
indirectly, "[t]o make any untrue statement of a material fact or to omit to state a
material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

"The Supreme Court has held that, to maintain a private damages action under § 10(b) and Rule 10b-5, 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 (2d Cir. 2012) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (the same).

The Defendants argue that the Plaintiff has not sufficiently pled a material misrepresentation or omission, has not sufficiently pled scienter with the particularity required by the PSLRA, and has not sufficiently alleged loss causation.

### i. Material Misstatement or Omission

The Complaint must be dismissed, the Defendants argue, because it lacks particular facts showing that any challenged statement was materially false or misleading.  [Dkt. 72-1, Defendants Memorandum of Law in Support of Motion to Dismiss, p 27].  They further claim that the Plaintiff's claim "rests on two sets of factually unsupported conclusions: (1) an unreasonable and unsupported

definition or organic growth, and (2) unreasonable inferences, based on deficient sources, to the effect that—in amounts generally left to the imagination—Tangoe inflated organic recurring revenue by allocating revenue inconsistently with plaintiff's own definition."  [*Id.*].  The Plaintiff responds that "[t]he Complaint contains specific factual allegations explaining: (1) how Defendants' methodology was inconsistent with any reasonable understanding of 'organic growth;' (2) the reasons why this metric was so material to investors; and (3) the extent to which Defendants' methodology resulted in an overstatement or organic recurring revenue growth such that Tangoe's actual organic recurring revenue growth was well below industry guidelines."  [Dkt. 77, Plaintiff's Opposition to Defendant's Motion to Dismiss, p. 20].

### 1.  Definition of Organic Growth

The Defendants first argue that the Plaintiff alleges the Defendants' artificially inflated organic growth metric is based on the Plaintiff's conclusory definition of organic growth, a term which has no uniform accounting definition. They then argue that even assuming the Plaintiff's definition is generally accepted, he does not support with any facts his allegations that the Defendants did not comport with this definition when calculating organic growth; instead, he alleges a series of conclusions and assumptions that deserve no consideration at this phase in the litigation.  The Plaintiff argues that the definition of organic growth is widely accepted, as the Defendants have admitted, and has sufficiently

supported his allegations of the Defendants' miscalculations with sufficient facts that are not conclusory.

Generally, "[t]he definition of materiality is . . . [w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (citations and internal quotation marks omitted).  "Materiality is an inherently fact-specific finding, . . . that is satisfied when a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716-17 (2d Cir. 2011) (citations and internal quotation marks omitted). "There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Id.* at 17 (citations and internal quotation marks omitted).  Accordingly, courts "must consider both quantitative and qualitative factors in assessing an item's materiality, . . . and that consideration should be undertaken in an integrative manner."  *Id.* (citations and internal quotation marks omitted).

There does not appear on the record a generally accepted definition of organic growth.  The Plaintiff variously defines organic revenue growth as growth calculated based on the revenue earned by a company, excluding revenue earned by another company that was acquired.  However, in one proposed definition, the Plaintiff asserts that the figure may include revenue growth of a company

22

acquired prior to the year of the organic revenue calculation, but in another definition, the Plaintiff appears to assert that the figure may never include revenue growth of a company acquired.  The Plaintiff claims that "[o]rganic revenue growth is revenue growth generated by a business as it historically exists.  It is generated by finding new customers, selling more product to existing customers, or developing and selling new products."  [Dkt. 66, ¶ 5].  Later, the Plaintiff alleges that "[b]usiness analysts typically measure organic growth by taking all revenue growth and subtracting acquired companies' contribution to revenues.  Thus, if Tangoe buys one company in 2011 and earns $10 million that year from that company, Tangoe's organic growth is calculated by removing $10 million from Tangoe's 2011 revenues and calculating the resulting growth amount.  Then, analysts take the remainder of the revenue growth to determine the organic revenue growth *rate*."  [*Id.* at ¶ 9].  According to this definition, revenues from an acquired company are not included in the calculation of organic revenue growth in the year of the acquisition.  It does not state that such revenue may not be included in subsequent years.  However, later the Plaintiff alleges that "[b]oth 'organic' and 'inorganic' growth have accepted definitions in the business community.  The definition of organic growth is growth generated by the company's existing business.  The definition of inorganic growth is growth generated by acquiring existing businesses.  Organic growth is measured by taking the company's revenue growth and subtracting the effects of acquisitions."  [*Id.* at ¶¶ 49-51].  To highlight this confusion, in a case cited by the Plaintiff, organic growth appears to include properly the successful transition or

23

growth from acquired companies, leveraging economies of scale and cross-selling products and services to the customers of acquired companies, revenues from which the Plaintiff now asserts should not be included in the Defendant's organic growth calculation.  *See In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1344 (N. Ga. 2012).

The Defendants confirmed that the term has a variety of different constructions, stating that "there are a number of different ways in which companies and analysts can calculate organic growth," but the "most narrowly defined definition . . . includes acquisitions after an acquisition has been with the company for four full quarters . . . ."  [*Id.* at ¶ 156].

Other authorities support the Defendants' contention that there is no one specific definition or construction of "organic growth."  Generally, organic growth is defined as "internal" growth where "a young venture grows from its own strengths and therefore with its own resources."  Matthew R. Marvel, *Encyclopedia of New Venture Management*, Sage Publications, 225 (2012). "Organic growth is different from the creation of earnings through accounting elections or valuations, financial engineering, structured transactions, related-party transactions, or the serial acquisition of revenue through mergers and acquisitions. . . . Historically, academics define organic growth as nonacquiring growth."  Edward D. Hess*, The Quest for Organic Growth*, Corporate Finance Review July/August 2007, *available at* 2007 WL 8321806.  However, this Court has not found, and neither party has supplied, one uniform measure for calculating

24

such growth, and there is no GAAP rule dictating how such growth should be calculated.  For example, SRA International, a publicly traded company, stated in its securities filings that it includes acquired company growth in its organic growth computation:

> [w]e calculate organic growth by comparing our actual reported revenue in the current period, *including revenue attributable to acquired companies* with adjusted revenue from the prior-year period.  In arriving at prior-year revenue, we include the revenue of acquired companies and remove the revenue of divested companies from the prior-year periods comparable to the current-year periods for which the companies are included in our actual reported revenue. The resulting growth rate is intended to represent our organic, or non-acquisitive, growth year-over-year, including comparable period growth attributable to acquired companies.

SRA International 10-Q, filed Nov. 10, 2008 (emphasis added).  This definition appears to be different from the sources cited above.  Obviously, the need for defining the calculation comes from the lack of uniformity among publicly traded companies in calculating organic growth.  Therefore, it appears that companies are free, within the parameters or reasonableness, to calculate organic growth as they wish.

Indeed, in one of the cases cited by the Plaintiff in support of his opposition to the motion to dismiss, the defendant stated, in response to a question about its organic growth figure, that "we feel answers should come from a very unbiased manner from outside parties, because in the past we have given answers and people have started to do organic calculations. . . . [A]nalysts do it

25

their own way . . . . All of the numbers are reported . . . . So we feel people should do their analysis independently on their own." *In re Ebix*, 898 F. Supp. 2d at 1338 (N. Ga. 2012). In *In re Omnicom Group*, the plaintiff asserted that organic growth "is a measure of a company's growth from existing operations, generally understood to mean corporate assets owed for at least one year." *In re Omnicom Group, Inc. Sec. Litig.*, No. 02 Civ. 4483(RRC), 2005 WL 735937, at *1 (S.D.N.Y. March 30, 2005). In that case, however, the court found the plaintiff's complaint insufficient to sustain a motion to dismiss on the organic growth claim because the fact that a corporation accounted "differently while comparing their numbers to their competitors' organic growth" is not a misstatement for purposes of the Act. *Id.* at *5. Obviously, this holding is premised on the fact that no one method of calculation exists for organic growth; instead, companies are permitted to exercise some freedom in their accounting methodology even though it may then not "calculate organic growth in the same way that [their] competitors [do] and in the manner that analysts and investors expect." *Id.*

The general variableness in calculating organic growth is also highlighted by the analyst reports relied on by the Plaintiff to support its theory that Tangoe's organic growth was artificially inflated. The three analyst reports cited in the Complaint all arrive at very different figures for Tangoe's organic growth during and after the Class Period. For example, Copperfield Research concluded that Tangoe's real organic growth rate was almost "50% lower year-to-date than the 25% growth rate many analysts have forecasted." [Dkt. 73-12, p. 10]. That report also stated that "[i]n response to the StreetSweeper's report, a myriad of sellside

26

analysts have produced reports in a matter of hours, attempting to defend Tangoe.  These analysts have argued that Tangoe's organic growth is indeed 20-25% per year, just as management has claimed."  [*Id.* at p. 2].  Conversely, Wedbush stated that "Copperfield research implies real organic growth of total revenue of 14% in 1H12.  However, we believe the Copperfield analysis takes a more aggressive view of acquired revenue and assumes revenue from acquisitions was flat. . . . we believe true organic recurring growth in the 15%-20% range." [Dkt. 73-12].  As is clear from these reports, some analysts view Tangoe's organic growth figures as dramatically overstated, others view the figures as just slightly overstated, while others support and defend Tangoe's figures as issued. Importantly, this confirms that there is no one method for calculating organic growth, but rather several acceptable constructions.

Given these facts, this Court agrees with the court in *In re Omnicom* that the Defendants cannot be held liable for a misstatement for merely calculating organic growth in a manner different from the method used by some, clearly not all, of the analysts who issued reports on Tangoe's organic growth rate where there is no GAAP or other universally accepted definition of the term.  "The complaint here simply alleges that Defendants did things differently while comparing their numbers to their competitors' organic growth. . . . [T]hese allegations do not amount to deceptive statements or omissions."  *In re Omnicom*, 2005 WL 735937, at *5; *see also AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 254 F. Supp. 2d 373,  386 (S.D.N.Y. 2003) ("To the extent that the plaintiffs allege that the numbers were misleading because other retailers may

27

have used different calculations or accounting practices, the plaintiffs fail to point to any statements that purport to represent that all retailers used the same accounting methods to measure delinquencies or that the accounting measures used by Heilig-Meyers, while allegedly 'non-standard,' . . . were not acceptable accounting standards.  Indeed, even if the plaintiffs had alleged that the measures used by Heilig-Meyers failed to comply with Generally Accepted Accounting Principles . . ., such a statement would be insufficient to comply with Rule 9(b), since there would be no basis to conclude that the practices actually used were fraudulent."); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 878-79 (9th Cir. 2012) (affirming dismissal of securities fraud suit where the plaintiff's "allegations of 'falsity' [were] essentially disagreements with the statistical methodology adopted by the doctors and scientists who designed and conducted the study" at issue in that case).

The Plaintiff's reliance on *In re Ebix, supra.* is unpersuasive.  In that case, the plaintiff contended that the company's actual organic growth rate was "minimal" and even that there was "no [organic] growth."  *In re Ebix Sec. Litig.*, 898 F. Supp. 2d 1333 (N.D. Ga. 2012).  Therefore, when the company alleged that it had organic growth rates in the mid 20% range, there was not a dispute simply over the method of calculation, but over the existence of any growth at all.  Importantly, the court found that the complaint indicated that "Ebix's organic growth was not nearly that strong, if it was occurring at all.  Witnesses allege that Ebix was not successfully transitioning or growing its acquired companies, nor was it successfully leveraging economies of scale or cross-selling

28

opportunities." *Id.* at 1344.  Interestingly, the court did not explain what was meant by organic growth, but in the analysis above, it appears that it would have, or at least could have, included revenue from transitioning or growing the acquired companies.  In the Complaint here, the Plaintiff does not make the types of allegations at issue in *In re Ebix*; instead, his entire premise is that the organic growth was overstated because the manner in which the Defendants calculated organic growth was not what investors had anticipated.  Since several analysts supported Tangoe's calculations and the Plaintiff's own sources reflect that there is some discrepancy in the appropriate measure of Tangoe's organic growth, this case is more similar to *In re Omnicom.*

The Plaintiff's reliance on its supplemental authority is also unavailing.  In *In re Delcath Sys., Inc. Sec. Litig.,*  the court found sufficient allegations to overcome a motion to dismiss and sustain a securities fraud claim when a medical device manufacturer released statistics of the death rate and the serious adverse experience rate for only the group using the device, omitting the experience of the control group, despite the fact that the FDA "Special Protocol Assessment" for the clinical trial of the drug, designed to assess the safety, efficacy, and proper dosage of a drug, required patients to be randomly assigned to one of two groups, a  drug group and the control group, and the inclusion of the statistical findings for the control group would have naturally altered the reported statistics.  *In re Delcath Sys., Inc. Sec. Litig.,* No. 13-civ.-3116(LGS), 2014 WL 2933151, at *8 (S.D.N.Y. June 27, 2014).  This analysis is really irrelevant to the inquiry before this Court because the issue here is a conflict over the definition

and construction of organic growth.  In *In re Delcath Sys.*, the parties did not dispute how to calculate death rates or the definition of a serious adverse experience.  The FDA-mandated protocol established the probative statistics and operated much like a definition.  At issue was only the omission of the control group statistics.  There the court held that omitting unfavorable statistical findings of the FDA-mandated clinical drug trial protocol materially mislead the public as to the safety of the drug and materially altered the information made available to the market.   Here, on the other hand, there is no standard definition of organic growth nor is there a protocol for its calculation.  Alleging merely that the Defendants used a different definition of the term is insufficient to render their disclosures misstatements or that their failure to disclose how they calculated it constituted an actionable omission.

Even ignoring the definition issue, the Plaintiff has still not met his burden on the merits of the claim.  The Plaintiff ultimately argues that the Defendants have overstated their organic growth by including in its metric, revenues attributed to the core subsidiary from acquired companies' pipeline projects, from the acquired company's products sold to existing Tangoe customers, from Tangoe's products sold to the acquired company's customers, and from the acquired company's customers that were migrated to Tangoe's platform.  [Dkt. 66, ¶¶ 12-14].  In so doing, the Plaintiff argues that these methods are themselves fraudulent or unacceptable.  However, the Plaintiff does not support this argument with a factual basis sufficient to overcome a motion to dismiss, and instead relies on the conclusory statement that these are fraudulent methods

30

because organic growth does not include revenue from acquisitions.  *In re*

*Omnicom*, 2005 WL 735937, at *5.  ("The complaint seeks to rest on Defendants'

public comparisons of its organic growth [with] that of its competitors[, b]ut the

court in *AIG* made clear that such comparisons are not enough to plead deceptive

statements or omissions absent allegations that the defendants' different

accounting practices were themselves deceptive in some way.").  As discussed

above, there is no one definition or construction for organic growth.  Therefore,

without explaining how or why the Defendants' actions are fraudulent, the

Plaintiff cannot withstand a motion to dismiss.[4]

　　　Assuming that these accounting methods were fraudulent, the Plaintiff

does allege sufficient facts supporting some of its conclusion that Tangoe was

recording revenues as it alleged.  In support of his conclusion, the Plaintiff offers

several witness statements regarding how the Defendants recoded acquisition-

---

[4] On the contrary, looking to the public statements made by Tangoe's executives, it appears that Tangoe was at least ambiguous about how it was calculating organic growth.  For example, Martino stated "[s]o in summary, we are very excited about the acquisition.  Tangoe has a successful track record of integrating acquisitions; migrating customers on to our platform and cross-selling our suite of solutions, which we expect to translate to additional organic growth opportunities longer term."  [Dkt. 66, ¶ 65].  Subbloie also stated that "[w]e have had a successful track record of driving strong organic growth as well as integrating acquisitions and cross-selling our suite of solutions and believe our acquisition of ProfitLine further expands Tangoe's market leadership position."  [*Id.* at ¶ 60].  And, "[f]rom a long-term perspective, we intend to selectively execute M&A to deliver accelerated growth and increase our market share, which will augment our targeted organic recurring revenue growth of 20% or better."  [*Id.* at ¶ 120].  Given the ambiguity of these statements and the absence of a generally accepted calculation of organic growth, a reasonable investor should have understood that they were put on inquiry notice as to Tangoe's calculations before relying on Tangoe's representations.

based revenue.  Some of these statements support the Plaintiff's conclusions,

but others do not.  First, the Plaintiff states that Thompkins, an Account Manager

for Telwares and Tangoe after the acquisition, stated that immediately or shortly

after the acquisition, the migration of Telwares customers would permit Tangoe

to "eat up the competition."  [Dkt. 66, ¶ 38].  This statement, however, does little

to shed any light on Tangoe's accounting practices.  "Eat up the competition"

does not lead to the inference that Tangoe would attribute Telwares revenues to

Tangoe; instead, it leads to the conclusion that Tangoe was becoming more

competitive because it was acquiring the competition.  Second, Roger, the

Director of Operations at Telwares, was in charge of "shifting clients to Tangoe's

client management software platform" after the acquisition.  [*Id.* at ¶ 39].  He

reported that after the acquisition, he began calling the acquired company's

customers, seeking to sell them Tangoe's other products.  [*Id.* at 57].  As related

to the accounting practices, Roger reported that "Telwares prepared its financial

statements for Tangoe's use after Tangoe acquired it.  Mr. Roger reports that

Telwares was not provided with revenue numbers from the acquired companies.

Thus, Mr. Roger reports, the financial statements Telwares prepared did not list

revenues from migrated customers."  [*Id.* at ¶ 63].  These allegations also do not

describe Tangoe's accounting practices.  Even though this may be sufficient to

conclude that the Plaintiff may have included revenues from migrated customers

into its organic growth figure, the Plaintiff has not provided any details showing

that Roger, who appears to be a technical engineer reporting to Tangoe's Chief

Operating Officer ("COO"), has any financial expertise or was even involved in

the preparation of the financial statements.  When reviewing testimony at the pleading stage of confidential informants, the Second Circuit has stated that the witnesses' identities may be withheld if the sources are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *see also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 138 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (the same).  Therefore, at this stage, the Plaintiff is required to explain why or how Roger would have had the financial background or was privy to the finance department's methodology before his statements can be used to withstand a motion to dismiss.  It has not done so.

Unlike Roger, Oster, the Vice President of Finance and Corporate Controller at ProfitLine, clearly has sufficient financial knowledge to make statements regarding Tangoe's accounting policies, as she was responsible for keeping Tangoe's books and generating its financial statements.  She, however, only alleged that "ProfitLine's outlook for 2012 . . . was for 'stable' revenues." [Dkt. 66, ¶¶ 82-83].  This accusation relates more to the deferred revenues analysis than it does to any specific accounting practices.  Accordingly, it does not support the Plaintiff's conclusions related to Tangoe's accounting methodology.  Bennett, the Director of Account Management, was responsible for selling Tangoe's products to existing HCL clients.  [*Id.* at ¶ 47].  While this fact supports the conclusion that Tangoe was selling its products to the acquired companies' customers, it says nothing about how Tangoe recorded the revenues.

33

Moreover, Bennett's recollection that "[t]here was no organic growth.  It was all game bought.  [Subbloie's] numbers were a joke.  We sat there and laughed," is nothing more than a conclusory allegation that deserves no weight at this stage. [*Id.* at ¶ 48].

Aside from Roger, the only witness that seems to plead any facts supporting the Plaintiff's conclusions is Guyotte.  Guyotte was the Director of Mobile Sales at Tangoe—a role in which he led a sales force team in the Management Division.  [*Id.* at ¶ 42].  While participating in the weekly conference calls on which all of the recent contracts would be reviewed, he stated that it was made clear that Tangoe was "gobbling up" the acquired companies' revenues and improperly attributing them to Tangoe's Core subsidiary.  [*Id.* at ¶ 44]. "Gobbling up" revenues in this context seems to support the claim that Tangoe was attributing revenues from the pipeline projects to its core subsidiary.  This is later supported when Guyotte reported that when Tangoe acquired ProfitLine, it attributed about $2-3 million in revenues from ProfitLine's pipeline projects to Tangoe's core subsidiary.  [*Id.* at ¶ 84].  Similarly, according to Guyotte, "HCL had $1-1.5 million in revenues in its pipeline when Tangoe acquired it.  Immediately following the acquisition, Tangoe attributed all of this revenue to Tangoe's Core Subsidiary in order to artificially generate 'organic' growth.  Guyotte adds that when Tangoe acquired companies that had signed contracts with clients without having begun performing on the contract, Tangoe always attributed revenues from those clients to its own Core Subsidiary, tough the acquired company serviced the contracts."  [*Id.* at ¶ 69].  Guyotte also stated that he was personally

34

involved in efforts to contact the acquired company's clients to sell them Tangoe's products, from which the revenue, he understood, would be attributed to Tangoe.  [*Id.* at ¶ 70].  However, it should be noted, that reliance on Guyotte and Roger suffers from the same flaw, namely, that there are no facts alleged showing that Guyotte was involved in or had knowledge of Tangoe's accounting or financial calculations.  It is true that Guyotte participated in weekly calls for which memoranda were prepared detailing the clients and revenue streams, but this does not support the contention that he knew how to calculate organic growth or, more importantly, that he knew how Tangoe calculated organic growth.  Without identifying specific statements in these reports showing that the organic growth metric was false or that Guyotte had first had knowledge of the alleged falsity, the claims would likely fail.

However, the Court is satisfied that had these claims been properly substantiated by a knowledgeable witness, attributing revenues from pipeline projects or revenues from pre-acquisition sales cannot be included in any definition of organic growth.  Therefore, the allegations related to this accounting practice could be sufficient to sustain a motion to dismiss if the Plaintiff had alleged the materiality of these specific accounting practices.  Unfortunately, as will be discussed later, the Plaintiff relies merely on the general principle that organic growth below the 20% benchmark is material for SaaS companies.  While this is sufficient to withstand a motion to dismiss if all of the fraudulent accounting practices were sufficiently alleged, the Plaintiff does not describe which method is responsible for what percentage of the alleged fraudulent

calculation.  Therefore, had the Plaintiff showed that the attribution of pre-acquisition sales to the core subsidiary resulted in a certain percentage of overstatement of organic growth, the Court would be able to make the necessary materiality determination.  In this case, however, the Plaintiff has failed to make such an allegation.  Therefore, even though this accounting practice may have been contrary to any organic growth calculation, the Plaintiff has failed to describe whether this practice alone resulted in any material misstatement.  Therefore, the motion to dismiss would be granted.

Disregarding the problems discussed above with respect to witnesses' knowledge and materiality, these witness statements only support two of the alleged revenue tactics: (1) Tangoe attributed pipeline revenue from the acquired companies to its core subsidiary; and (2) Tangoe sold its products to the acquired company's clients and attributed that revenue to its core subsidiary.  The remaining methods, however, are not supported by anything but conclusory allegations.  For example, as related to the claim that revenue from migrated clients was attributed to Tangoe, the Complaint alleges that "[o]nce Tangoe had finished migrating a customer from HCL to Tangoe's platform[,] Tangoe attributed revenues earned from servicing that client – including revenues earned from providing that client with the services it had previously obtained through HCL – to Tangoe's Core's subsidiary."  [*Id.* at ¶ 71].  This allegation contains no facts permitting this Court to draw that inference; there is no allegation that Guyotte, or any witness, knew this personally or was involved in the revenue redistribution.  Similarly, there is no allegation in the Complaint that supports the theory that

36

Tangoe attributed revenues to its core subsidiary from the acquired companies'
products that it sold to its clients.  Guyotte stated that "Tangoe would, whenever
it acquired a company, attempt up-selling and cross-selling.  The revenues from
all such up-selling and cross-selling revenues [sic] were attributed to Tangoe's
Core Subsidiary."  [*Id.* at ¶ 85].  However, it is not clear to the Court, and it is
never explained, what the Plaintiff means by cross selling or up selling.
Furthermore, assuming that the term cross-selling was meant to cover both
Tangoe's sales of its products to the acquired companies' customers and the
sale of the acquired companies' products to Tangoe's customers, there are no
facts showing or explaining one incident of cross-selling with respect to Tangoe
selling the acquired companies' products.  Without specificity as to any particular
sale, this conclusory allegation is insufficient to sustain a motion to dismiss.
Therefore, at best, the Complaint supports the contention that two of the alleged
accounting tactics occurred.    Moreover, it is not clear that the inclusion of
revenue from cross selling is impermissible.  *See In re Ebix*, 898 F. Supp. 2d at
1344.  An acquiring company's use of the customer list of an acquired company
to expand its own customer base is an expected synergy of mergers and
acquisitions.  It does not detract from the fact that the acquired company must
nonetheless convince the customer of the propriety of purchasing the product or
service offered, and if it succeeds, it must deliver a satisfactory product or
service to the customer.  There is little difference between this and the customary
practice of purchasing customer lists and other product lists to prospect for new
customers.

Furthermore, Tango's public statements actually suggested that its growth would be augmented by synergies resulting from acquisitions.  As discussed previously, Martino stated "we are very excited about the acquisition.  Tangoe has a successful track record of integrating acquisitions; migrating customers on to our platform and cross-selling our suite of solutions, which we expect to translate to additional organic growth opportunities longer term."  [Dkt. 66, ¶ 65].  Subbloie also stated on an earnings call that "[w]e have had a successful track record of driving strong organic growth as well as integrating acquisitions and cross-selling our suite of solutions and believe our acquisition of ProfitLine further expands Tangoe's market leadership position."  [*Id.* at ¶ 60].  These statements make clear Tangoe's intention of engaging in the type of integrations the Plaintiff now alleges resulted in a fraudulent organic growth figure.

To further support its accounting methodology conclusions, the Plaintiff also relies on a deferred revenues analysis, which shows that the Defendants' deferred revenues either decreased or remained largely stagnant during the Class Period—a period during which one would expect to see increased deferred revenues if the Defendants' organic growth was increasing to the extent represented.  However, as the Defendants correctly point out, this deferred revenues analysis is not based on facts, which at this period this Court is obligated to accept as true, but instead based on a set of assumptions and conclusions.  *See Incantalupo v. Lawrence Union Free School Dist. No. 15*, 652 F. Supp. 2d 314, 331 (E.D.N.Y. 2009) ("In applying the plausibility standard set forth in *Twombly* and *Iqbal*, a court 'assume[s] the veracity' only of 'well-pleaded

factual allegations,' and draws all reasonable inferences from such allegations in the plaintiff's favor. . . . Pleadings that 'are no more than conclusions,' however, 'are not entitled to the assumption of truth.'" (quoting *Iqbal*, 556 U.S. at 1950)). Even though this Court is required to draw all permissible inferences in favor of the plaintiff at the motion to dismiss stage, it is only required to draw those inferences from facts that are sufficiently pled.  The Defendants, in their motion to dismiss, have proffered at least an equally set of plausible explanations for why Tangoe's deferred revenues decreased or remained stagnant during this time; principally, because their business that historically generated deferred revenues was not growing, and the business strategy of billing by month became increasingly popular during the Class Period.  On a 2011 earnings calls, Martino stated that "[i]t is important to appreciate that deferred revenue is not an indication of business activity for Tangoe for two primary reasons.  First[, we're predominantly on a monthly billing term, so new sales do not contribute much of anything to deferred revenue.  Second, we still have deferred revenue that is related to legacy maintenance contracts which is amortized annually and we are not adding to this space with our subscription contracts."  [Dkt. 73-3, p. 6]. Therefore, since the deferred revenues analysis is a conclusory presentation based on Tangoe's revenues and other information gleaned from public filings, this Court need not accept as true the conclusions reached by the Plaintiff.  To be clear, this conclusion does not rest on a factual finding by the court; but rather it rests on the Plaintiff's failure to allege facts to support its allegations necessary to overcome the Defendants' motion to dismiss.

39

In light of the authorities, the Plaintiff has failed to allege how the Defendants made a fraudulent or misleading statement, and the Complaint cannot overcome a motion to dismiss under the heighted pleading standards of a Rule 9(b).

### 2.   Quantification of Inflated Organic Growth

The Defendants next argue that the Plaintiff has failed to sufficiently allege the amount by which Tangoe's organic growth was overstated.  [Dkt. 72-1, p. 30]. While it is true that courts require the magnitude of any inflation in accounting figures to be clearly alleged, the purpose of this requirement is related to the materiality of the misstatement.  In *In re Omnicom*, for example, the court stated that "without more particular allegations" regarding the magnitude of the overstatement, "the court was unable to state that the overstatements were material."  *In re Omnicom*, 2005 WL 735937, at *5; *see also Litwin*, 634 F.3d at 717 (noting that in *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009), the court noted that a "five percent numerical threshold is a good starting place for assessing . . . materiality).  Here, however, the Plaintiff has sufficiently alleged that the benchmark for materiality of organic growth in the SaaS industry is 20%.  [Dkt. 66, ¶¶ 115].  Therefore, any figure below this benchmark is material from an investor perspective.  The Plaintiff has also provided three analyst reports that ultimately found Tangoe's organic growth to be 15-20%, clearly falling below the 20% threshold.  This is sufficient at this stage to allege materiality had all of the Plaintiff's alleged

fraudulent accounting methods been sufficiently pled.  The Defendants' reliance
on *In re Omnicom* is unavailing because in that case no quantification was
provided.  The court noted that the complaint "states in a conclusory fashion that
Omnicom's method of calculating organic growth led them to overstate such
growth as compared to competitors without alleging what the organic growth
would have been had Omnicom used a different calculation."  *In re Omnicom*,
2005 WL at 735937, at *5.  Here, however, the Plaintiff has alleged that had Tangoe
used a different calculation, it would have found that its organic growth was 15-
20% instead of above 20%.  Therefore the Plaintiff has sufficiently alleged
quantification with respect to materiality had all of the accounting tactics been
adequately pled.[5]

        ii.  Scienter

The Defendants also argue that the Plaintiff has insufficiently alleged the
requisite scienter.  [Dkt. 72-1, pp. 31-39].  The PSLRA "requires plaintiffs to state
with particularity both the facts constituting the alleged violation, and the facts
evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or
defraud."  *Tellabs*, 551 U.S. at 313 (citations and internal quotation marks
omitted).  "Under this heightened pleading standard for scienter, a 'complaint will
survive . . . only if a reasonable person would deem the inference of scienter
cogent and at least as compelling as any opposing inference one could draw

---

[5] As noted previously, however, the materiality prong has not been sufficiently
met for any one particular accounting method.

from the facts alleged." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324); *see also NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 3:09-cv-01740(VLB), 2013 WL 1188050, at *31 (D. Conn. March 23, 2013) (same).  The proper inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.  The "strong inference" standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered.  *Slayton*, 604 F.3d at 766 (quoting *Tellabs*, 551 U.S. at 324).  This inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.

A plaintiff may show an inference of scienter in two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

The Defendants argue that the Plaintiffs allegations of scienter are conclusory and convoluted, failing to articulate any specific facts permitting a strong and cogent inference of scienter.  [Dkt 72-1, p. 31].

### 1.  Motive and Opportunity

"Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.  Opportunity

42

would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Novak*, 216 F.3d at 207 (citations omitted). "General allegations that identify the same motives 'possessed by virtually all corporate insiders' are not sufficient to create a strong inference of fraudulent intent." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 412 (S.D.N.Y. 2003) (quoting *Novak*, 216 F.3d at 207)). Instead, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). The Plaintiff alleges that the motive and opportunity prong has been satisfied because Defendants sold large amounts of stock, which resulted in increased revenues from the inflated stock price, and because Tangoe engaged in a roll-up acquisition strategy. [Dkt. 77, p. 22-24].

"The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 207-08)). However, to give rise to an inference of fraudulent intent or scienter, the trades must be "unusual." *Id.* "[E]xecutive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." *Malin*, 499 F. Supp. 2d at 150-51 (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004)). To determine whether trading activity is "unusual," courts should consider various factors, including "the amount of profit from the sales, the proportion of stockholdings sold, the change in volume of insider sales, and the number of

insiders selling." *In re Scholastic Corp.*, 252 F.3d at 74-75 (citing *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000)).  "Plaintiffs bear the burden of demonstrating that Defendants' stock sales are 'unusual.'"  *Malin*, 499 F. Supp. 2d at 150 (citing *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995))

As related to insider trading, the Plaintiff only alleges that "[a]ttached as Exhibit 1 [to the Complaint] and incorporated by reference is a chart showing stock sales of all Defendants."  [Dkt. 66, ¶ 132].  Exhibit 1 displays data showing the amount of sales and purchases made by each of the named Defendants during the Class Period; one entry, however, shows that Edison, for which Golding is a Director, sold $20,661,000 worth of shares outside the Class Period on 5/22/2013.  The Complaint offers no other explanation or contextualization of this table.  Moreover, in response to the Defendants' motion to dismiss, the Plaintiff argues, in its entirety, "[a]s set forth in the Chart as Exhibit A attached hereto, Defendant Subbloie profited by over $4.9M in sales of Tangoe shares during the Class Period; Defendant Martino by over $1.7M; and Defendant Golding by over $59M.  Moreover, while each did make purchases during the Class Period, such acquisitions were through the exercise of options at $1-$2 per share, well below the market level."  [Dkt. 77, pp. 23-23].

The Defendants argue that the Plaintiff has not provided sufficient contextual detail to render the sales "unusual"; in fact, Tangoe's public filings prove that Subbloie's total holdings increased during the Class Period by 1.76%

44

and Martino's holdings only decreased by 2.51%, comprised of less than 20% of his total pre-Class Period Holdings.  [Dkt. 72-1, p 37].

In *Malin*, the court stated that the "Plaintiffs, in alleging that Defendants' trading activity during the Class Period gives rise to an inference of scienter, focus solely on Defendants' sales of XL stock during the Class Period.  The [complaint] alleges only the number of shares each executive sold, the share price on the date sold, and the gross profit realized from each sale."  *Malin*, 499 F. Supp. 2d at 151.  The court concluded that "[i]t is impossible from the information provided by the Plaintiffs, to determine whether the sales were "'unusual in timing or amount.'"  *Id.*  Similarly here, the Plaintiff bases the scienter element on the amount of stock sold during the class period and the amount of gross revenue generated.  Adding the details provided by the Defendants, which are found in publicly available securities filings, reveals that the Plaintiff has not sustained his burden in showing that the sales by either Martino or Subbloie are unusual in amount or timing.

First, at the beginning of the Class Period, Martino was listed as having 695,010 shares.  [Dkt. 74-2].  There is no data for any Defendant prior to the Class Period seemingly because the IPO occurred on August 1, 2011.  At the end of the Class Period, Martino had 677,589 shares, a net difference of only -17,421 shares. [*Id.*].  Ultimately, throughout the Class Period Martino sold 130,835 shares, which was counter-balanced by stock purchases or options, and the total amount of sold shares constituted 18.8% of his pre-Class Period holdings.  [*Id.*].  Subbloie

45

started with 2,176,778 shares and ended with 2,215,003, for a net difference of 38,225, and he only sold 408,307 shares. [*Id.*]. Therefore, Subbloie actually ended the Class Period with more ownership investment in Tangoe than at the beginning, "a fact wholly inconsistent with fraudulent intent." *Malin*, 499 F. Supp. 2d at 152 (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. at 561); *see also Acito*, 47 F.3d at 54 (finding that stock sales that amounted to less than eleven percent of holdings failed to qualify as "unusual" in a case where it was alleged that insider delayed disclosure of negative inspection results of a manufacturing plant); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 276 (S.D.N.Y. 2008) (finding the plaintiff's allegations were not sufficient to show stock sales as unusual when the defendants sold "less than 20% of their total stockholdings during the relevant time period").   By contrast, In *In re Scholastic Corp.*, the court found sufficient allegations of motive and opportunity in a securities fraud action where the defendant insider sold 80 percent of his holdings in a book publisher within a matter of days at a profit, after not having sold any stock for more than one year, when it was alleged that the insider's concealment of certain facts ultimately caused the price of the publisher's stock to drop precipitously, even though the insider realized only a relatively small amount of $1.25 million in gross proceeds from the sales.  *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 74-76 (2d Cir. 2001).  Clearly the facts in that case are much more egregious than those alleged here.

Nothing also appears inappropriate about the timing of the sales.  The Plaintiff's Exhibit seems to imply that the sales of the shares by both Martino and Subbloie occurred around the time of the IPO and the secondary offering. Generally, since executives can otherwise be restricted temporally from making stock sales, it would not be unexpected to see sales at these times.  Moreover, given the allegations in the Complaint that the IPO was initially conducted to generate funds, it is completely normal that the executives would sell large amounts of stock around the time of the IPO and the secondary offering so as to generate capital by selling ownership interests in the company.  Finally, the Plaintiff's statement in its briefing to the motion to dismiss, which does not appear in the Complaint, that the shares purchased by Subbloie consisted of vested stock options resulting in a $1-2 purchase price is not sufficient to render his extra purchases of stock during the Class Period unusual, questionable, or specious because the result, that the Defendant owned an ownership interest in the company that increased over the Class Period, is wholly inconsistent with fraudulent intent.  If, as one would assume, the Defendants had the intention of profiting by making false statements, one would not expect to see them make a sale of stock and then reinvest some of those proceeds in Tangoe, nor would one expect to see Martino sell such a small percentage of his shares.  *See City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 396 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ("The mere fact that defendants had access to stock options and were compensated according to the performance of their company, both of which are ubiquitous in corporate

America, can hardly form the basis for a strong inference of scienter."); *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (rejecting generalized allegations "that stock sales, exercise of options, and receipt of bonuses" creates a strong inference of scienter, especially when after exercising the stock options, the complaint did not allege that the defendants "then turned around and sold those shares, as opposed to retaining them."). Accordingly, the Plaintiff has not sufficiently alleged facts that allow the Court to draw the inference that the trades by Martino and Subbloie were unusual. Without contextualizing its data, the Plaintiff has failed to prove scienter as to these Defendants.

Turning to Golding's trades, the Plaintiff does not respond to the Defendants' motion to dismiss as related to his stock sales. Even so, the Court finds that had the Plaintiff may have sufficiently alleged motive as related to Golding because it is undeniable that he in some way profited from the over $80 million proceeds that Edison, the company in which he is a general partner, received from selling the stock. The Complaint, however, does not sufficiently allege that Golding had any relationship to the alleged misstatements. In *Russo v. Bruce*, the court found that the opportunity element of scienter was not sufficiently alleged when the complaint did not attribute any of the public statements to the outside director named as a defendant, nor did it "plead facts suggesting that [the defendant] . . . exerted any control over . . . [the] public statements." *Russo v. Bruce*, 777 F. Supp. 2d 505, 517-18 (S.D.N.Y. 2011); *see also In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 204-05 (E.D.N.Y. 1997)

("[T]he court finds that the plaintiffs have not alleged a 'strong inference' of recklessness or conscious misbehavior" when "[t]he plaintiffs allege that as a result of her status as a member of the Board of Directors of Health Management, [the director] was responsible for monitoring the overall management and direction of Health Management and was also privy to inside information" because they "do not provide specific allegations of fact in support of [the director's] alleged fraudulent conduct" and rely on insufficient "conclusory allegations.").  The Plaintiff here alleges that Golding was "at all relevant times, a director on [Tangoe's] Board, and caused to be sold 5,045,271 shares of [Tangoe's] common stock during the Class Period for proceeds of approximately $80.8 million."  [Dkt. 66, ¶ 33].  Importantly, the Complaint does not allege what position Golding held on the Board; so there is no indication that he was in charge of reviewing or affirming public statements by Subbloie or Martino or that he was in any way involved with the public statements alleged to be fraudulent.  Furthermore, the Complaint only alleges that he signed the "registration statement," as opposed to Martino and Subbloie who signed the "financial statements" and the "registration statement."  [*Id.* at ¶¶ 31-33].  Without facts tying Golding to the public statements or to Tangoe's financial statements, the Plaintiff has failed to sufficiently prove Golding's involvement such that he would have the "opportunity" to affect the misstatements and benefit therefrom.

The second basis alleged by the Plaintiff to fulfill the scienter requirement is that the acquisition-based strategy employed by Tangoe would not have been

possible except for the inflated stock price.  [Dkt. 77, p. 23].  While it is true that in certain circumstances "the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter," *Rothman v. Gregor*, 220 F.3d 81, 93 (2d. Cir. 2000), the Second Circuit still requires, at least with respect to individual defendants, allegations that individual "defendants engaged in these transactions to secure personal gain," as opposed to carrying out their "financial responsibilities to the Company."  *Dobina v. Weatherford Intern. Ltd.*, 909 F. Supp. 2d 228, 242 (S.D.N.Y. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004).  In *Dobina*, the court quickly rejected the acquisition-strategy theory of scienter as related to individual named defendants where the plaintiff failed to sufficiently allege a personal benefit from the acquisition strategy.  *Id.* Here too, the Plaintiff has failed to sufficiently allege any personal benefit, outside of the stock trades made by the Defendants, and, furthermore, has failed to tie any specific benefit to the acquisition strategy.  Accordingly, this Court too can quickly find that the pleadings do not sufficiently allege scienter as to the individual Defendants based on scienter.[6]  *See also Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, 02 CIV. 1230(LMM), 2004 WL 1124660, at *4 (S.D.N.Y. May 20, 2004) (finding that plaintiffs failed to allege sufficient scienter without alleging concrete benefits to the named defendants in the acquisition context).

---

[6] As stated above, even though the Plaintiff may have sufficiently pled a benefit to Golding, he has failed to allege how Golding influenced any of the acquisitions made by the Company.  Without these allegations, the Plaintiff has not pled sufficient "opportunity" as to Golding to sustain the motion to dismiss on scienter grounds.

The question as to whether the roll-up strategy evidences sufficient intent with respect to Tangoe is a more difficult question.  "While 'artificial inflation of stock prices in order to acquire another company . . . 'in some circumstances' [may] be sufficient for scienter,'' the 'desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired or to acquire another' and therefore generally is insufficient."  *Dobina*, 909 F. Supp. 2d at 242 (quoting *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 n.6 (2d Cir. 2009) (quoting *Rothman v. Gregor*, 220 F.3d 81, 92-94 (2d Cir. 2000))).  "Whether an interest in acquisitions is sufficient is an 'extremely contextual' inquiry that demands an allegation of a 'unique connection between the fraud and the acquisition.'"  *Id.* (quoting *ECA*, 553 F.3d at 201 n.6)).  Even though the Second Circuit has provided little guidance as to what constitutes a unique connection, it has suggested that it is sufficient for the mere allegation that the "misstatements directly relat[e] to the acquisition."  *ECA*, 553 F.3d at 201 n.6 (citing *Cohen v. Koenig*, 25 F.3d 1168, 1170-71, 1173-74 (2d Cir. 1994)).

In *Dobina*, the court held the unique connection "requirement demands more than alleging simply that the Company acquired companies during the class period with the use of stock."  *Dobina*, 909 F. Supp. 2d at 243.  In so doing, the court noted that accepting the converse "would allow a plaintiff to proceed to discovery whenever it can allege that a company that is growing through the issuance of equity made a statement that ultimately proved to have been

51

materially false but helped to raise the company's share price.  That conclusion is inconsistent with the PSLRA and our Circuit's requirements of a 'unique connection' between the fraud and the acquisition . . . ." *Id.* at 243-44.  Similarly, in *Nairobi*, the court dismissed the complaint for lack of pleading sufficient scienter when the complaint did not allege that the defendant corporation "accomplished any of its acquisitions with the use of stock as consideration." *Nairobi*, 2004 WL 1124660, at *4; *compare In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 214-15 (S.D.N.Y. 2004) (finding sufficient on a motion to dismiss allegations that an inflated stock price was planned to be used in a stock-for-stock acquisition of another company).

Keeping these authorities in mind, it is clear that the Plaintiff in this case has not sufficiently pled the scienter requirement with respect to the roll-up strategy because there are no allegations linking the acquisition strategy to the inflated stock price.  The Plaintiff here does not allege how Tangoe's stock was used in the acquisitions, such as in a stock-for-stock merger.  Moreover, there are no allegations that Tangoe even used its shares in acquiring the other companies in its roll-up strategy.  Therefore, the Plaintiff has not demonstrated the "unique connection" between the roll-up strategy and the alleged misstatements leading to an inflated stock price.  If we were to accept the Plaintiff's argument as being sufficient, this would permit any securities class action to proceed to discovery when a company is alleged to have made a misstatement, which generally by definition causes an increase in stock value, and also acquires companies in a

52

business strategy wholly unrelated to the misstatement.  This clearly cannot be the purpose of the PSLRA.

In conclusion, the Plaintiff has not sufficiently pled motive and opportunity with respect to any Defendant.

### 2.  Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

The Plaintiff also alleges that the Defendants access to information coupled with their past securities-related litigation provides sufficient circumstantial evidence to show conscious misbehavior or recklessness.  [Dkt. 77, pp. 24-26].

In the absence of sufficient allegations of falsity, the Complaint may survive if the plaintiff proffers facts lending credence to a strong inference of conscious misbehavior or recklessness, although "the strength of the circumstantial allegations must be correspondingly greater if there is no motive." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 199.  This pleading standard requires allegations showing that the defendant's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Rothman*, 220 F.3d at 90 (citations omitted).  "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported

53

fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* at 199; *see also Pitney Bowes*, 2013 WL 1188050, at *33 (same).  Pleadings have been found sufficient when they have "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Kalnit*, 264 F.3d at 142 (citations omitted).  If plaintiffs rely on allegations that the defendants had access to facts contradicting their public statements, the plaintiffs must "specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309 (citations omitted).  Allegations of recklessness have also been sufficient where the allegations demonstrate that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* at 308.

Here, the Plaintiff alleges that the "Defendants do not – and cannot – claim that they did not have access to information or did not know how Tangoe calculated organic growth." [Dkt. 77, p. 29].  The problem with this argument, as discussed *supra*, is that the Plaintiff has failed to show that there is one method for calculating organic growth.  Therefore, even assuming that the Defendants had access to the information from which their organic growth calculation was made, there are insufficient pleadings to show that they were acting recklessly by adopting a more liberal construction of the term, rather than the conservative

54

definition espoused by the Plaintiff.  Even ignoring this, the Plaintiff has not

detailed with the required specificity the reports viewed by the Defendants that

contained the organic growth metric or that the witnesses to the weekly sales

meetings even knew how to calculate organic growth or knew how Tangoe was

calculating organic growth.  The Complaint alleges that

> [e]very week, Mr. Guyotte received a memorandum
> which listed all the pending and recently closed
> contracts at Tangoe.  For every contract, the
> memorandums provided (a) the salesperson
> responsible, (b) the salesperson's manager, and (c) the
> total revenue expected from the contract.  Guyotte then
> attended hour-long conference call[s] Tangoe held every
> Monday afternoon to discuss the weekly memorandums.
> Subbloie and Martino frequently attended, and Guyotte
> remembers that they made comments during these
> calls.  The weekly memorandums made clear to Guyotte
> that Tangoe was 'gobbling up' the acquired companies'
> revenues and improperly attributing them to Tangoe's
> Core Subsidiary.

[Dkt. 66, ¶¶ 43-44].  Later, the Plaintiff repeated that during the Class Period,

> Tangoe provided senior management weekly
> memorandums focused on revenues.  The weekly
> memorandums set out every single contract in which
> Tangoe expected to earn revenue, and for each contract
> provided the customer's name, the revenue amount, the
> sales representative, the sales representative's
> manager, the date of the contract, and if it was closed or
> still pending.  The weekly memorandums were produced
> in an Excel spreadsheet and organized using
> Salesforce.com software.

[*Id.* at ¶ 124].  These allegations do not "specifically identify the reports or

statements containing" *the information* related to the misstatement.  *Novak*, 216

F.3d at 309 (citations omitted).  The Plaintiff fails to allege any facts that show that

the information contained in the weekly reports or the nature of the discussions contradicted the organic growth figure announced in earnings calls.  From the Complaint, it appears that the reports detailed revenue amounts for the weekly sales for individual contracts, not quarterly sales that were the basis of the earnings calls.  Furthermore, the Plaintiff does not allege how these reports contradicted the organic growth figures released by Subbloie and Martino.   As such, the Plaintiff has not alleged that any of the witnesses who were privy to these reports knew how Tangoe calculated organic growth nor saw, for example, a line in the report that contradicted the public statements.  The conclusory allegations that the witnesses felt that Tangoe was "gobbling up" revenues or that it was attributing revenues to its core subsidiary improperly are wholly unsupported by any facts explaining how the witnesses reached these conclusions.  These "vague and generalized allegations" are insufficient to establish scienter. *Pitney Bowes*, 2013 WL 1188050, at *34.

Recognizing that "general allegations that, by virtue of their senior positions . . ., the individual Defendants necessarily had access to nonpublic information, are insufficient to show recklessness under the law of this Circuit," the Plaintiff offers another theory he alleges shows circumstantial evidence of misbehavior: prior securities-related litigation.  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009).  The Plaintiff argues that the Defendants' involvement in the alleged accounting fraud of IMA and resulting securities class action settlement proves the Defendants' scienter as related to the present action.  [Dkt.  77, p. 26].  This Court disagrees.

Generally, under the rules of evidence, "wrongful acts evidence may not be admitted merely to show the defendant's propensity to commit the act in question." *Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir. 1991) (citing Fed. R. Evid. 404(b)). Here, there is no doubt that the Plaintiff is attempting to use prior bad acts as circumstantial evidence to show that the Defendants consciously "misbehaved," but this is an impermissible use of such evidence. Moreover, the facts surrounding the prior proceeding are clearly distinguishable from the allegations in the Complaint. The prior suit resulted from "cooked books" regarding overall profitability, not organic growth—a term with no standardized definition or manner of calculation. In the prior case, the company itself, it appears, released a "press release" disclosing the inflated revenue figures, but in the present case Tangoe has not admitted to the Plaintiff's allegations that its organic revenue was inflated and some independent analysts agree that it was not inflated. Furthermore, the fact that Subbloie and Martino settled the claim prior to the ruling on the motion to dismiss is of little weight. During litigation, IMA had already sought bankruptcy protection; therefore, the prospect the plaintiffs had in that case for any recovery was minimal. Accordingly, there are plenty of reasons, aside from guilt, which could have led to a speedy settlement of the issues. These factors demonstrate that the two proceedings are not sufficiently identical to permit the Plaintiff's use of the past proceeding as circumstantial evidence of conscious misbehavior or recklessness in the present case. *See also Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, No. 11 Civ. 2890(GBD), 2013 WL 2154220, at *2 (S.D.N.Y. March 29, 2013) ("Plaintiffs' citation to a number

of lawsuits and government investigations involving the . . . Defendants also provides no evidence of scienter."). Accordingly, the Plaintiffs have failed to sufficiently plead scienter to sustain a motion to dismiss.

### iii.  Loss Causation

The final element at dispute with respect to the 10(b) claim is loss causation—the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (citations and internal quotation marks omitted); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("Loss causation, by contrast, is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."). "The Burden of establishing loss causation rests on the plaintiff." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) (citing 15 U.S.C. § 78u-4(b)(4)).  Generally,

> loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant.  If that relationship is sufficiently direct, loss causation is established; but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie.  That is because the loss-causation requirement—as with the foreseeability limitation in tort—is intended to fix a legal limit on a person's responsibility, even for wrongful acts.

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (citations and internal quotation marks omitted).  "[T]o establish loss causation, 'a plaintiff must

allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered', i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  Otherwise, the loss in question was not foreseeable." *Id.* at 173.

"'Loss causation can be established either where (1) the market reacted negatively to a corrective disclosure or (2) the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused plaintiffs' loss.'" *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 493 (D. Conn. 2013) (quoting *In re Omnicom*, 541 F. Supp. 2d at 551).  "Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss.  By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed—i.e. a corrective disclosure." *Id.* (quoting *In re Public Offering Sec. Litig.*, 399 F. Supp. 2d 98, 307 (S.D.N.Y. 2005).

"To be 'corrective' a disclosure must 'reveal the falsity of the alleged misstatements.'" *In re Xerox*, 935 F. Supp. 2d at 493 (quoting *In re Omnicom*, 541 F. Supp. 2d at 552).  "However, there is no requirement that the corrective disclosure take a particular form or be of a particular quality. . . . It is the exposure of the falsity of the fraudulent representation that is the critical component of loss causation." *Id.* (citations and internal quotation marks omitted).  "'While a disclosure need not reflect every detail of an alleged fraud, it

59

must reveal some aspect of it.'" *Id.* (quoting *In re Omnicom*, 541 F. Supp. 2d at 552). "'Moreover, the disclosed fact must be new to the market,' and therefore '[a] recharacterization of previously disclosed facts cannot qualify as a corrective disclosure.'" *Id.* (quoting *In re Omnicom*, 541 F. Supp. 2d at 551-52); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (affirming dismissal when the corrective disclosures never "purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint").

Here, the Plaintiff relies on two corrective disclosures that occurred during the Class Period and one disclosure that occurred after the Class Period; all of the disclosures came in the form of analyst reports, none, therefore, were admissions by Tangoe or its officials that its organic growth metric was overstated.[7]  [Dkt. 66, ¶¶ 149-59].  The analyst reports were clearly in the Plaintiff's possession at the time the Complaint was drafted and were incorporated into the Complaint as the Plaintiff quoted extensively from each report.  [Dkt. 66, ¶¶ 149-53].  The Court, therefore, may consider these documents on a motion to dismiss.  *See Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011) ("Courts may also properly consider matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had

---

[7] Courts have split on whether Rule 8(a) or Rule 9(b) applies to pleading the loss causation element, but this Court need not address that issue because the Plaintiff has not pleaded sufficient loss causation under either standard.  *See Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (discussing split in authority).

knowledge and relied on in bringing suit" in considering a motion to dismiss pursuant to Rule 12(b)(6) (citations and internal quotation marks omitted)).

As stated earlier, the SweetSweeper analyst report concluded, among other things, that Tangoe's organic growth figures appeared to have included revenues generated from acquisitions, rather than merely internal resources.  [Dkt. 66, ¶ 149].  After this report was released, Tangoe stock dropped $3.39 per share, or roughly 17%.  [*Id.* at ¶ 150].  The Plaintiff fails to highlight that StreetSweeper made several important disclosures in the reports.  First, the report constantly affirmed that the analysis was based on Tangoe's public "filings," meaning that the information contained in the analysis was already in the public domain.  The report nowhere indicates that it had non-public, insider information related to Tangoe's operations that helped reveal some clandestine business practices.  Second, StreetSweeper does not pretend to be a neutral observer; instead, it clearly disclosed that it "established a financial position in [Tango] prior to the publication of [the] report and will profit on future declines in the share price." [Dkt. 73-11, p. 8].  Similarly, the Copperfield report stated that "[d]espite ample opportunity to expand on the StreetSweeper's material, we will instead focus this report on irrefutable facts that have been meticulously gathered from SEC documents and other corporate filings."  [Dkt. 73-12, p. 2].  It also disclosed that "[a]s of the publication date, the author of this report has a short position in the company covered herein and stands to realize gains in the event that the price of the stock declines."  [*Id.* at p. 1].  It concluded that it was "unable to reconcile CFO Martino's public statements about organic growth.  Current SEC filings

61

combined with the management's guidance at face value, leads to an implied organic revenue growth rate that IS WELL BELOW 20%.  Based on our analysis, we believe Tangoe's organic growth rate may be almost 50% lower year-to-date than the rate many analysts have communicated."  [*Id.* at p. 3].  Importantly, as highlighted *infra*, the report also stated that "[i]n response to the StreetSweeper's report, a myriad of sellside analysts have produced reports in a matter of hours, attempting to defend Tangoe.  These analysts have argued that Tangoe's organic growth is indeed 20-25% per year, just as management has claimed."  [*Id.* at p. 2].  Finally, the third report, which was published outside of the Class Period, also was based on public "filings" and never states or implies that it was based on any non-public or private source.  [Dkt. 73-13, p. 1].  Wedbush also disclaimed that it "does and seeks to do business with companies covered in its research reports."  [*Id.*].  This report concluded that "[w]hile recent reports from TheStreetSweeper and Copperfield Research suggest Tangoe's management may have misrepresented organic growth and OCF estimates masked by an aggressive rollup strategy, after our initial analysis and rounds of checks, we believe the truth lies somewhere in between."  [*Id.*].  Wedbush calculated the organic growth in the first quarter of 2012 as "in between 15-20%" range, while Copperfield concluded that it was "14%."  [*Id.*].

The Second Circuit recently affirmed that "a negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure" for purposes of the loss causation analysis.  *In re Omnicom*, 597 F.3d at 512.  In that case, the plaintiff alleged that the defendant used an acquisition to

62

remove losses from its balance sheets. *Id.* at 511. Previous news reports, however, disclosed that fact over a year prior to the alleged "corrective disclosure" in the complaint—a newspaper article that repeated these allegations. *Id.* at 511. Therefore, the court held that since the use of the transaction as an accounting method to "remove losses from Omnicom's books was known to the market a year before," the alleged corrective disclosure did not reveal any new facts to the market, and, therefore, could not be a corrective disclosure for loss causation purposes.[8] *Id.* at 512.

The Eleventh Circuit agreed with this holding in a recent decision.[9] In *Meyer v. Greene*, the court found that since "[t]he efficient market theory . . . posits that all publicly available information about a security is reflected in the market price of the security," to sufficiently plead loss causation, "corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Meyer v. Greene*, 710 F.3d 189, 1197-98 (11th Cir.

_____

[8] The Plaintiff argues that the cases cited by the Defendant in support of its motion to dismiss are distinguishable because they were decided on a motion for summary judgment, not a motion to dismiss. [Dkt. 77, p. 30 n. 16]. However, contrary to this contention, several cases have been decided on a motion to dismiss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 36, 346 (2005) ("Our holding about plaintiffs' need to prove proximate causation and economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to allege these requirements."); *Lentell*, 396 F.3d at 177 (affirming dismissal on loss causation grounds where the plaintiff "offer[ed] no factual basis to support the allegation that . . . misrepresentations and omissions caused the losses.")

[9] The Eleventh Circuit cited, among other authorities, two Second Circuit cases in arriving at its conclusion. *See Meyer*, 710 F.3d, at 1197-989 (citing *Lentell,* 396 F.3d at 175 n.4; *In re Omnicom*, 597 F.3d at 512).

2013) (citations and internal quotation marks omitted).  In that case, the Plaintiff attempted to bring a securities class action, alleging that a short-seller analyst presentation, claiming that the defendant company's assets were significantly overvalued, served as a corrective disclosure to previous public misstatements. *Id.* at 1192-93.  The presentation, however, contained "a disclaimer on the second slide . . ., stating that all of the information in the presentation was 'obtained from publicly available sources.'  Indeed, the material portions of the [presentation] were gleaned entirely from public filings and other publicly available information." *Id.* at 1198.  The court held that since a corrective disclosure "obviously must disclose new information, the fact that the sources used in the [presentation] were already public is fatal to the Investors' claim of loss causation." *Id.* (citations and internal quotation marks omitted).  The court also rejected the plaintiff's theory that the analyst report can serve as a corrective disclosure since it "provided expert analysis of the source material that was previously unavailable to the market" because "the mere repackaging of already public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure." *Id.* at 1199.  (citations and internal quotation marks omitted).  Importantly, the court noted that analyst reports or short-seller opinions may constitute sufficient corrective disclosures if they "reveal to the market something previously hidden or actively concealed," but accepting a corrective disclosure based on public information would allow "every investor who suffers a loss in the financial markets" to "sue under § 10(b) using an analyst's negative analysis of public filings . . . ." *Id.* at 1199, 1199 n.10.  When

64

using the presumptions provided by the efficient market theory, plaintiffs must be aware that it serves as "a Delphic sword: it cuts both ways."[10]  Corrective disclosures can come in the form of journalistic articles, but the market is presumed to analyze and digest immediately all public information, including information in securities filings.  *Id.* at 1198.

The position taken by the Second and Eleventh Circuits has also been adopted by other circuits as well.  *See Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time"); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270-71 (3rd Cir. 2005) (holding that the *Wall Street Journal*'s analysis of previously available information was not a corrective disclosure even when the analysis conducted somewhat complex mathematical calculations on the figures reported in the company's public filings).

Just as the Eleventh Circuit highlighted, when analyst reports do suffice as corrective disclosures, they reveal facts or are based on information that has not been previously disclosed to the public.  In *Lormand v. US Unwired, Inc.*, the Fifth Circuit found an analyst report sufficient to serve as a corrective disclosure when

---

[10] The Plaintiff's claim is premised on the efficient market theory.  [*See* Dkt. 66, ¶ 177].  "The efficient market theory . . . posits that all publicly available information about a security is reflected in the market price of the security."  *Meyer*, 710 F.3d at 1197 (citation omitted).  Any "information released to the public is immediately digested and incorporated into the price of a security."  *Id.*  Therefore, information that has already been digested "will not cause a change in the stock price."  *Id.* (citation omitted); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 241-46 (1988).

it revealed previous undisclosed information related to weak demand for the company's new services and when it disclosed unreported high "churn" or turnover rates, information which apparently was known by the officials making contrary public statements, but not to the public. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 259-260 (5th Cir. 2009).  The information from this report was not found in public filings and, therefore, appears to have been based on some nonpublic or unknown source.

Just as in *Meyer,* the Plaintiff here relies on reports that clearly indicate the source of their analysis: Tangoe's public filings.  There is no indication that the reports contained or were informed by any inside information, sources, or facts not already revealed to the public.  As the Complaint makes clear, the Plaintiff is relying on "an active and efficient market," and, therefore, must be prepared for, as the Eleventh Circuit aptly stated, its Delphic sword.  [Dkt. 66, ¶ 177].  More importantly, as stated above, the Plaintiff's own analyst reports prove that Tangoe's organic growth metric cannot be labeled as objectively false because all three of the reports arrived at a different organic growth figure, illustrating that there are a variety of ways of computing the amount.  This result prevents the Plaintiff from convincingly arguing that Tangoe obfuscated its organic growth calculation because Tangoe's construction was acceptable to at least some analysts.[11]  Therefore, nothing in these reports adequately shows that Tangoe's

_____

[11] The Plaintiff also omitted that by August 23, 2013, Tangoe's stock price did, in fact, surpass the closing price from just before the SweetSweeper report was

computation of organic revenue was improper.  *See In re Omnicom*, 597 F.3d at 512 (noting after concluding that the corrective disclosure was not sufficient since it was a negative journalistic characterization of previously disclosed facts, the reports did not present a "hard fact" suggesting that the alleged improper accounting techniques were even "improper.").  Accordingly, the types of analyst reports used by the Plaintiff as corrective disclosures are not the types of reports found by several of the Circuits to be sufficient to sustain a motion to dismiss.

The few cases cited by the Plaintiff in support of his opposition are easily distinguishable because in those cases the courts found sufficient loss causation when the market reacted to analyst or news reports containing new corrective facts or information, not a mere negative recharacterization of already public information.  *See In re BP P.L.C. Sec. Litig.*, 922 F. Supp. 2d 600, 637-38 (S.D. Tex. 2013) (the truth was "outed" when media reports revealed new information about the company's safety standards); *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013) (corrective disclosure consisted of a company's revelation that it "had problems with service and the integration of its systems," which were not previously revealed to the market); *In re eSpeed, Inc. Sec. Litig.*,

---

issued.  [Dkt. 84-4, Table of Daily Tangoe Prices from August 27, 2012 to January 10, 2014].  As stock prices are public information, courts are permitted to take judicial notice of these figures.  *See In re Bear Stearns Cos., Inc. Sec. Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 507 n.14 (S.D.N.Y. 2011) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 for the proposition that a "district court may take judicial notice of well-publicized stock prices" on a motion to dismiss).  This pattern seems to demonstrate that the cause of Tangoe's stock drop was not the revelation of the any new falsity, but the efforts by short sellers to drive down the stock price in exploiting the variableness of an ambiguous accounting term.

457 F. Supp. 2d 266, 296-97 (S.D.N.Y. 2006) (new information was discovered about disappointing financial results).[12]  Accordingly, since the Plaintiff has not sufficiently alleged loss causation, his Complaint must be dismissed.

### iv.  Control Persons Claim

Finally, the Plaintiff alleges control person liability under Section 20(a) of the Exchange Act against Defendants Martino, Subbloie, and Golding.  [Dkt. 66, ¶¶ 181-187].  Section 20(a) provides that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "'To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some

---

[12] As the Plaintiff insufficiently pled loss causation, the Court will not address the Defendants' argument that loss causation is also insufficiently pled because the Plaintiff has not quantified the amount of loss caused by the comments related to organic growth as opposed to the other negative comments related to Tangoe's general accounting controls and its executives' securities-related history.  It should be noted though, that at the pleading stage, the Plaintiff is required to allege facts "that would allow a factfinder to ascribe some rough proportion of the whole loss to" the misstatements.  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007).

meaningful sense, a culpable participant in the controlled person's fraud.'"
*Pitney Bowes Inc.*, 2013 WL 1188050, at *37 (quoting *ATSI Commc'ns*, 493 F.3d at
108). Because the Plaintiff has failed to sufficiently allege a violation of section
10(b) of the Exchange Act, the Plaintiff's count for control person liability under
Section 20(a) cannot stand. Accordingly, this count is dismissed.

### v. Sanctions

The PSLRA mandates that "at the end of any private securities action, the
district court must 'include in the record specific findings regarding compliance
by each party and each attorney representing any part with each requirement of
Rule 11(b).'" *Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (quoting 15
U.S.C. § 78u-4(c)(1)). "And, if the court finds that any part or lawyer violated Rule
11(b), the PSLRA mandates the imposition of sanctions." *Id.* The first inquiry
under the PSLRA, therefore, is whether there has been a Rule 11(b) violation.
Rule 11(b) provides in relevant part:

> [b]y presenting to the court a pleading, written motion,
> or other paper—whether by signing, filing, submitting,
> or later advocating it—an attorney or unrepresented
> party certifies that to the best of the person's
> knowledge, information, and belief, formed after an
> inquiry reasonable under the circumstances: (1) it is not
> being presented for any improper purpose, such as to
> harass, cause unnecessary delay, or needlessly
> increase the cost of litigation; (2) the claims, defenses,
> and other legal contentions are warranted by existing
> law or by a nonfrivolous argument for extending,
> modifying, or reversing existing law or for establishing
> new law; (3) the factual contentions have evidentiary
> support or, if specifically so identified, will likely have
> evidentiary support after a reasonable opportunity for

> further investigation or discovery; and (4) the denials of
> factual contentions are warranted on the evidence or, if
> specifically so identified, are reasonably based on belief
> or a lack of information."

Fed. R. Civ. P. 11(b).  The standard for triggering the award of fees under Rule

11(b)(2) is "objective reasonableness."  *Margo v. Weis*, 213 F.3d 55, 65 (2d Cir.

2000).  "The operative question is whether the argument is frivolous, i.e., the legal

position has 'no chance of success,' and there is 'no reasonable argument to

extend, modify or reverse the law as it stands."  *Fishoff v. Coty Inc.*, 634 F.3d 647,

654 (2d Cir. 2011).  In this case, the Defendants have not argued that the Plaintiff's

submissions have violated Rule 11(b), and the Court agrees that even though it

has dismissed the Complaint in its entirety for failing to adequately allege a

material misstatement, the requisite scienter, and loss causation, the Complaint

cannot be characterized as frivolous.  Therefore, the Court declines to impose

sanctions in this matter.  *See Livingston v. Cablevision Sys. Corp.*, 966 F. Supp.

2d 208, 223 (E.D.N.Y. 2013) ("The court finds that Plaintiffs' arguments, tenuous

as they may be, are not frivolous, even though they lack factual support.").

## V.    Conclusion

For the foregoing reasons, Defendant's [Dkt. 72] Motion to Dismiss is

GRANTED.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 30, 2014

70